# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BORUSAN MANNESMANN BORU SANAYI VE TICARET A.Ş., | NON-CONFIDENTIAL |
| Plaintiff, | |
| v. | Court No. 19-00056 |
| UNITED STATES, | |
| Defendant. | |

## COMPLAINT

Plaintiff, Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. ("BMB"), by and through its counsel, hereby alleges and states as follows:

### SUMMARY AND NATURE OF THIS ACTION

1. Plaintiff BMB is a Turkish producer and exporter to the United States of large diameter welded line pipe ("LDWP") that is the subject of the affirmative final less than-fair-value determination and antidumping duty order issued by the U.S. Department of Commerce, International Trade Administration ("Commerce") that is being challenged in this action. LDWP is used to construct large pipelines for the transmission of oil and gas. The record evidence submitted by BMB and verified by Commerce demonstrated that BMB was not dumping LDWP in the U.S. market, and Commerce therefore should have reached a negative less-than-fair-value determination with respect to BMB and excluded it from the antidumping duty order on LDWP from Turkey.

2. Commerce's affirmative determination with respect to BMB is the product of four significant legal errors in the calculation of BMB's dumping margin that should be reversed by this Court: First, Commerce failed to adhere to its normal date-of-sale methodology for

1

merchandise sold pursuant to long-term contracts (called "purchase orders" in this instance) and instead used the invoice date of individual LDWP shipments as the date of sale. Commerce used the invoice date, rather than the purchase order date, despite verified record evidence showing that all material terms of sale were established in the purchase orders for the two pipeline projects investigated by Commerce and that the prices and all other material sales terms for the individual shipments were in strict conformity with the terms of those purchase orders. Correction of that error results in a negative dumping margin. Second, Commerce failed to fully adjust for a late delivery penalty paid by BMB despite an express consortium agreement that established BMB's responsibility for this penalty. Correction of this error results in a negative dumping margin. Third, Commerce adjusted BMB's actual costs of production based on a finding that a particular market situation ("PMS) existed in Turkey due to subsidies that "distorted" the market for hot-rolled steel coil ("HRC"), the primary raw material input for LDWP. Commerce made this determination despite the fact that Commerce has determined in multiple countervailing duty determinations, including the countervailing duty investigation of LDWP from Turkey conducted concurrently with the instant antidumping investigation, that there was no distortion in the market for HRC. Fourth, Commerce erroneously found that BMB purchased freight and warehousing services from an affiliated supplier in Turkey at less than arm's length prices. Each of these legal errors is further elaborated below.

## JURISDICTION

3. Plaintiff bring this action pursuant to Sections 516A(a)(2)(A)(i)(II) and 516A(a)(2)(B)(i) of the Tariff Act of 1930, *as amended* ("the Act"), 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i). This action is an appeal of Commerce's final determination in the antidumping duty investigation of LDWP from Turkey. *Large Diameter*

2

*Welded Pipe From the Republic of Turkey: Final Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 6,362 (Dep't Commerce Feb. 27, 2019) ("*Final Determination*"), and accompanying Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair Value Investigation of Large Diameter Welded Pipe from the Republic of Turkey (Feb. 19, 2019) ("*Final Determination IDM*"). The *Final Determination* covers the period January 1, 2017 through December 31, 2017.

4. This Court has jurisdiction by reason of 28 U.S.C. § 1581(c).

## STANDING

5. Plaintiff, BMB, is a producer and exporter of LDWP from Turkey.

6. Plaintiff was a party to the underlying investigation by Commerce and participated in the investigation by supplying questionnaire responses and verifying those responses with Commerce and by filing a case brief and a rebuttal brief. Therefore, Plaintiff is an interested party pursuant to 19 U.S.C. § 1516a(f)(3) and 19 U.S.C. § 1677(9)(A). As an interested party that actively participated in the proceeding below, Plaintiff has standing to commence this action under 19 U.S.C. § 1516a(a)(2)(A), 19 U.S.C. § 1516a(d), 28 U.S.C. § 2631(c), and 28 U.S.C. § 1581(c).

## TIMELINESS OF THIS ACTION

7. On February 27, 2019, Commerce published in the *Federal Register* the challenged *Final Determination*. On May 2, 2019, Commerce published in the *Federal Register* the antidumping duty order. *Large Diameter Welded Pipe From the Republic of Turkey: Amended Final Affirmative Antidumping Duty Determination and Antidumping Duty Order*, 84 Fed. Reg. 18,799 (Dep't Commerce May 2, 2019). Plaintiff filed a summons initiating this appeal on May 2, 2019 pursuant to Sections 516A(a)(2)(A)(i)(II) and 516A(a)(2)(B)(i) of the

Act, 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and (B)(i), which was within thirty (30) days of publication of the antidumping duty order in the *Federal Register*. This action was therefore timely filed pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II), 28 U.S.C. § 2636(c), and U.S. Court of International Trade Rule 3. This complaint is being filed on May 3, 2019, which is within 30 days of the filing of the summons and is thus timely filed under Court of International Trade Rule 3(a)(2).

## STATEMENT OF FACTS

8. On February 9, 2018, Commerce initiated an antidumping duty investigation into LDWP from Turkey in response to a petition filed on behalf of American Cast Iron Pipe Company, Berg Steel Pipe Corp., Dura-Bond Industries, Skyline Steel, Stupp Corporation, and the American Line Pipe Producers Association (collectively, "Petitioners"). *Large Diameter Welded Pipe From Canada, Greece, India, the People's Republic of China, the Republic of Korea, and the Republic of Turkey: Initiation of Less-Than-Fair-Value Investigations*, 83 Fed. Reg. 7,154 (Dep't Commerce Feb. 20, 2018).

9. On March 6, 2018, Commerce selected BMB and HDM Spirally Welded Steel Pipe Co. Inc. as the two mandatory respondents to be individually investigated. *See* Memorandum to James Maeder, Associate Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations performing the duties of Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, from William Miller, International Trade Compliance Analyst, Office II, Antidumping and Countervailing Duty Operations, "Less-Than-Fair Value Investigation of Large Diameter Welded Pipe from the Republic of Turkey: Respondent Selection," (Mar. 6, 2018).

Facts Related To Date of Sale

10. In BMB's April 2, 2018 initial Section A questionnaire response, it informed Commerce that it would be reporting invoice date as the date of sale for home market sales, and final purchase order/contract date as the date of sale on its U.S. sales. BMB's U.S. sales during the POI consisted of sales made for two U.S. pipeline projects, one known as the [         ] project and one known as the [         ] project. Both projects covered multiple shipments of LDWP pipe over a period of years. *See* Letter to Sec'y of Commerce from Morris, Manning & Martin LLP, "Large Diameter Welded Pipe from Turkey, Case No. A-489-833: Response to Section A of Initial Questionnaire," (Apr. 2, 2018) ("BMB's Section A Questionnaire Response") at A-19.

11. In that same response and in several supplemental questionnaires, BMB explained that its sales of LDWP for both projects were made pursuant to long term supply contracts with U.S. pipeline company customers. These long term supply contracts were in the form of detailed "purchase orders" that set out each of the sales terms governing BMB's production and sale of LDWP for that project, including the sales price, quantity, detailed technical product specifications, delivery schedules, liquidated damages/penalty provisions, and numerous other material sales terms and conditions. *See* BMB's Section A Questionnaire Response at Exhibit A-9; Letter to Sec'y of Commerce from Morris, Manning & Martin, LLP, "Large Diameter Welded Pipe from Turkey, Case No. A-489-833: Response to Supplemental Sections A and C Questionnaire," (May 7, 2018) ("BMB's Supplemental Sections A and C Questionnaire Response") at 8-13 and Exhibit A-37; Letter to Sec'y of Commerce from Morris, Manning & Martin, LLP, "Large Diameter Welded Pipe from Turkey, Case No. A-489-833: Response to Supplemental Sections A-C Questionnaire," (June 15, 2018) ("BMB's Supplemental Sections A-

C Questionnaire Response") at 25-30. These sales terms could only be changed through a formal "purchase order modification." BMB explained that those purchase orders could not be modified by BMB without the explicit permission of the customer and that the customer could only make modifications by generating a revised purchase order. *Id.*

12. In the [          ] Terms and Conditions, it explicitly stated that no modifications could be made by the customer after the merchandise was either "completed" or "delivered" and the terms of sale for this purchase order were [          ]. BMB's Section A Questionnaire Response at Exhibit A-9; BMB's Supplemental Sections A and C Questionnaire Response at Exhibit A-36, p.4. All the merchandise had been produced by the end of December 2016 in strict compliance with the purchase order, [          ]. BMB made [   ] shipments pursuant to that purchase order in [          ]. Letter to Sec'y of Commerce from Morris, Manning & Martin, LLP, "Large Diameter Welded Pipe from Turkey, Case No. A-489-833: Response to Second Supplemental Sections A-C Questionnaire," (Aug. 3, 2018) ("BMB's Second Supplemental Section A-C Questionnaire Response") at Exhibit C-44.

13. The final [          ] purchase order was dated [          ] and while the purchase order did not provide explicitly for a date after which the purchase order could not be modified, all shipments for the project were shipped by the end of 2017 in accordance with the contracted milestone dates specified in the purchase order. *See* BMB's Supplemental Sections A and C Questionnaire Response at Exhibit A-37.

14. Consistent with Commerce's established practice of using contract date as the date of sale for sales made pursuant to long term supply contracts, *see* 19 C.F.R. § 351.401(i) and *Antidumping Duties; Countervailing Duties: Final Rule*, 62 Fed. Reg. 27,296, 27,349-50 (Dep't Commerce May 19, 1997), BMB reported the date of the purchase order as the date of sale for all

U.S. shipments of LDWP made under the [          ] and [               ] projects. BMB submitted extensive documentation to demonstrate that the final purchase order date was the appropriate date of sale for its U.S. sales because (1) all of the material terms of the sale, including quantity, price, delivery terms and dates, payment terms, and pipe grade, size, and coating, were set by the final purchase order and explicitly allowed the customer to reject the sale if the invoice and delivery were not in conformity with every term of the purchase order including the incorporated Terms and Conditions; (2) there were no changes after the final purchase order; (3) any changes to the purchase order with [            ] could only be made by formalizing all changes in a new binding purchase order which did not happen after [            ]; (4) in the case of [          ], the delivery terms of the purchase order were [        ] and all the pipe had been produced and was at the port for shipment by the end of 2016 so no modifications were allowed thereafter; and (5) BMB issued invoices and made shipments in complete conformity with the final purchase order in all respects. *See* BMB's Supplemental Sections A and C Questionnaire Response; BMB's Supplemental Sections A-C Questionnaire Response; BMB's Second Supplemental Section A-C Questionnaire Response.

15. Therefore, Commerce should have found that the date of sale for the [            ] sale was 2017 (during the POI), while the [        ] date of sale was 2016 based on the final amended purchase order date. There were [   ] shipments in January 2017, but the final purchase order for [        ], all the raw material purchases, production and delivery to the port were concluded prior to the end of 2016. *See id.*; Letter to Sec'y of Commerce from Morris, Manning & Martin, LLP, "Large Diameter Welded Pipe from Turkey, Case No. A-489-833: Cost Verification Exhibits," (Oct. 15, 2018) at CVE-14.

<u>Facts Related To Late Delivery Penalty</u>

16. In BMB's initial Section B questionnaire response, it informed Commerce that it

was reporting fees associated with a disputed late delivery penalty on sales to one of its major pipeline customers in the home market as a direct selling expense. Letter to Sec'y of Commerce from Morris, Manning & Martin, LLP, "Large Diameter Welded Pipe from Turkey, Case No. A-489-833: Response to Sections B-D of Initial Questionnaire Response," (Apr. 23, 2018) ("BMB's Initial Sections B-D Questionnaire Response") at p.B-48. BMB had entered into a consortium agreement with two other LDWP producers in Turkey for the specific purpose of entering into a supply contract with this pipeline customer to supply a particular pipeline project in Turkey. The consortium agreement was dated [          ] and made each member jointly and severally liable *vis a vis* the pipeline operator customer and set forth that each member had an obligation to reimburse the other consortium members for any damages caused by the failure to perform by that member. *See* BMB's Supplemental Sections A-C Questionnaire Response at Exhibit A-41.

17. In [          ], once the bid was awarded to the consortium, the contract between the pipeline operator customer and the consortium contained a penalty provision that required the consortium to pay penalties for any late deliveries. *See* BMB's Supplemental Sections A-C Questionnaire Response; Letter to Sec'y of Commerce from Morris, Manning & Martin, LLP, "Large Diameter Welded Pipe from Turkey, Case No. A-489-833: Submission of Field Number 38.0 (Direct Selling Expenses) Documentation from BMB's Second Supplemental Sections A-C Questionnaire," (July 6, 2018) ("BMB's July 6 Supplemental Questionnaire Response") at Exhibit B-32; BMB's Second Supplemental Section A-C Questionnaire Response.

18. While the LDWP for this pipeline project was scheduled to be produced and delivered by [          ], significant delays occurred leading the pipeline customer to impose a substantial penalty on the consortium. *See* BMB's July 6 Supplemental Questionnaire

Response at Exhibit B-32. BMB was responsible for a majority of these delays based on the calculations and documentation provided by the customer. The Consortium (based on the Consortium Agreement) used the customer's calculations to identify the delay that should be attributed to each member. BMB was obligated to reimburse the other consortium members for its own delays as provided by the consortium agreement. BMB did in fact reimburse each of the consortium members on the same day that the penalty was paid to the Customer. *See* Letter to Sec'y of Commerce from Morris, Manning & Martin, LLP, "Large Diameter Welded Pipe from Turkey, Case No. A-489-833: Submission of Field Number 38.0 (Direct Selling Expenses) Documentation from BMB's Second Supplemental Sections A-C Questionnaire," (July 6, 2018) at Exhibit B-32.

### Facts Related to PMS Finding

19. On July 10, 2018, Petitioners filed a particular market situation ("PMS") allegation arguing that a PMS existed such that the costs of production of LDWP in Turkey are distorted based on the cumulative effects of (1) the Government of Turkey's control of Eregli Demir Celik Fabrikiler Ticaret A.S. ("Erdemir"), the largest producer of flat-rolled steel in Turkey, and its affiliate Iskenderun Demir ve Celik A.S. ("Isdemir"); (2) Turkish subsidies on the hot-rolled coil ("HRC") and plate inputs; and (3) Turkish imports of HRC and plate from Russia and Ukraine as a result of Chinese overcapacity. In their PMS allegation, Petitioners argued that Commerce should make an upward adjustment to BMB's actual cost of production for LDWP by using the subsidy margin calculated in the CVD investigation of Hot-Rolled Steel from Turkey. See Letter to Sec'y of Commerce from Wiley Rein LLP, "Large Diameter Welded Pipe from Turkey: Particular Market Situation Allegation and Factual Information," (July 10, 2018).

20. On July 13, 2018 and August 3, 2018, BMB responded to the factual elements contained in Petitioners' PMS allegation. In these submissions, BMB established that (1) Commerce has repeatedly found in countervailing duty ("CVD") investigations, including the companion CVD investigation of LDWP, and in multiple administrative reviews involving other steel pipe products from Turkey that there is no distortion in the HRC market in Turkey; (2) BMB did not purchase HRC from Russia or Ukraine for the production of LDWP; (3) China's HRC market share in Turkey is minimal and has declined significantly since 2015; and (4) the CVD investigation of hot-rolled steel from Turkey was terminated. See Letter to Sec'y of Commerce from Morris, Manning & Martin, LLP, "Large Diameter Welded Pipe from Turkey, Case No. A-489-833: Rebuttal to Petitioners' Particular Market Situation Allegation," (July 13, 2018); Letter to Sec'y of Commerce from Morris, Manning & Martin, LLP, "Large Diameter Welded Pipe from Turkey, Case No. A-489-833: Rebuttal Factual Information to Petitioners' Particular Market Situation Allegation," (Aug. 3, 2018).

<u>Facts Related To Arm's Length Purchase of Services From Affiliated Parties</u>

21. In BMB's initial Section B and C questionnaire responses, BMB reported using an affiliated company, Borusan Lojistik, as well as other unaffiliated companies to provide certain freight and warehousing related services associated with its shipments of LDWP. BMB provided documentation in these questionnaire responses to demonstrate that it purchased home market inland freight, U.S. inland freight, and international freight at arms'-length prices. *See* BMB's Initial Sections B-D Questionnaire Response at Exhibits B-8, C-11, and C-15.

22. At Commerce's request, BMB provided additional documentation demonstrating the arms'-length nature of its purchases of additional services from Borusan Lojistik, including the expense incurred by Borusan Lojistik when it arranged for freight services on BMB's behalf

with unaffiliated freight service providers. *See* BMB's Supplemental Sections A-C Questionnaire Response at Exhibits B-23, B-24, C-27, C-31, and C-34; BMB's Second Supplemental Sections A-C Questionnaire Response at Exhibits C-46 to C-50.

### Commerce's Preliminary Determination

23. On August 27, 2018, Commerce published the preliminary determination of its antidumping duty investigation in the *Federal Register*. *Large Diameter Welded Pipe From the Republic of Turkey: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 83 Fed. Reg. 43,646 (Dep't Commerce Aug. 27, 2018) ("*Preliminary Determination*") and accompanying Issues and Decision Memorandum (Dep't Commerce Aug. 20, 2018).

24. In the *Preliminary Determination*, Commerce calculated a 5.29 percent estimated weighted-average dumping margin for BMB and 1) used the earlier of the invoice date or the shipment date for date of sale for all of BMB's home market and U.S. sales; 2) deducted only a portion of the penalty paid by BMB for its late deliveries as a post-sale price adjustment; 3) determined that BMB's purchases of freight and warehousing services from Borusan Lojistik were not at arms'-length based on a 98 to 102 percent test that Commerce used to measure the arms'-length nature of services provided by an affiliated company; and 4) found that a PMS existed in Turkey which distorted the cost of production of LDWP based on the factors alleged in Petitioners' PMS allegation and made an upward adjustment to BMB's costs equal to the CVD margin calculated in the terminated *Hot-Rolled Steel from Turkey* investigation. *Id.*

### Commerce's Verification of BMB

25. On September 10, 2018 and September 17, 2018, respectively, Commerce issued the sales and cost verification agenda outlines that it intended to follow at BMB's sales and cost verifications. Normally, such outlines for sales closely mirror the issues contained in

11

Commerce's Sections A-C questionnaire. Therefore, Commerce's standard sales verification outline typically includes a section entitled "date of sale." As BMB stated in its brief to Commerce, this section was included in the sales verification agendas for the LDWP antidumping duty investigations for South Korea and Canada. *See* Letter to Sec'y of Commerce from Morris, Manning & Martin, LLP, "Large Diameter Welded Pipe from Turkey, Case No. A-489-833: BMB's Case Brief," (Nov. 19, 2018) ("BMB's Case Brief") at p.2. However, it was removed in the sales verification agenda for the LDWP antidumping duty investigation for Turkey. Between September 17-21, 2018 and September 24-28, 2018, respectively, Commerce conducted sales and cost verifications of BMB's responses. *See* Memorandum to The File from Elizabeth Eastwood, Program Manager AD/CVD Operations, Office II and Rebecca M. Janz and William A. Miller, International Trade Compliance Analysts, AD/CVD Operations, Office II, "Verification of the Sales Response of Borusan Mannesmann Boru Sanayi ve Ticaret A.S. (Borusan) in the Antidumping Investigation of Large Diameter Welded Pipe from the Republic of Turkey," (Oct. 22, 2018) ("BMB Sales Verification Report"); Memorandum to The File from LaVonne Clark, Senior Accountant and Lakshmi Jones, Accountant, "Verification of the Cost Response of Borusan Mannesmann Boru Sanayi VE Ticaret A.S. (BMB), in the Antidumping Duty Investigation of Large Diameter Welded Pipe (LDWP) from Turkey," (Nov. 1, 2018).

26. At BMB's sales verification, Commerce verified that BMB's U.S. sales to each of its U.S. customers, as reported in BMB's U.S. sales database, complied in all respects with the terms of the final purchase orders for each of the customers. Commerce reviewed the specifications, the quantities, and the values of each product reported in BMB's U.S. sales database for both U.S. customers and compared them to the product specifications, and related quantities and values, in the relevant final purchase orders. This comparison demonstrated that

there were no differences from the terms of the purchase order. Commerce also observed that the delivery dates contained in the "milestones" were strictly followed. Commerce noted no discrepancies with respect to the documentation provided. *See* Letter to Sec'y of Commerce from Morris, Manning & Martin, LLP, "Large Diameter Welded Pipe from Turkey, Case No. A-489-833: Sales Verification Exhibits," (Sept. 28, 2018) ("BMB Sales Verification Exhibits") at Exhibit 4, pp.6, 11-12; BMB Sales Verification Report.

27. Commerce also verified the details surrounding the penalty paid by BMB for its late deliveries to one of its customers. The exhibit prepared by BMB and verified by Commerce demonstrated that 1) BMB entered into a consortium agreement in [         ] with two other LDWP producers who agreed that they would be jointly and severally liable *via a vis* the customer and that they were obligated to reimburse other consortium members for any damages due to failure to perform by that member; 2) the terms and conditions of the late delivery penalty were specified in the original [         ] contract and were known to all parties at the time of sale; 3) the consortium was notified about the penalty dispute in [         ] prior to the filing of the case; 4) the consortium entered into extensive negotiations with the customer to reduce the penalty even prior to January of 2018; and 5) BMB paid a substantially larger share of the penalty because it was responsible for a majority of the delays and therefore obligated to reimburse its consortium members for causing the delay in accordance with their agreement. BMB Sales Verification Exhibits at Exhibit 14, pp.49-52.

28. Commerce noted in its verification report for BMB's sales verification that "the consortium . . . determined among themselves the penalties for which each consortium member was responsible" and that "the consortium determined each member's' individual responsibility based on the same documentation used by {the customer} to calculate the total penalty." BMB

Sales Verification Report at 9.

29. In terms of the PMS allegation, at BMB's cost verification, Commerce verified that BMB did not purchase any HRC used to produce subject merchandise from Russia or Ukraine. *See* Letter to Sec'y of Commerce from Morris, Manning & Martin, LLP, "Large Diameter Welded Pipe from Turkey, Case No. A-489-833: Cost Verification Exhibits," (Oct. 5, 2018) at Exhibit 10.

### Briefing and Hearing Before Commerce

30. On November 19, 2018, BMB submitted its case brief and made the following arguments.

31. <u>First</u>, BMB argued that given the presumption in the case of long-term contracts that the invoice date is not the correct date of sale and the fact that the two final purchase orders for BMB's two U.S. customers set the essential terms of sale as verified by Commerce, the correct date of sale for each of BMB's U.S. sales is the date of the final purchase order that applied to each project. Both the final purchase order and shipments pursuant to that final purchase order for [     ] were in 2017. However in the case of [     ], all the merchandise had been produced and ready for shipment in 2016 pursuant to the final purchase order dated in 2016. The date of sale for [     ] was therefore in 2016 and the sales to [     ] were not made during the POI and should be disregarded. *See* BMB's Case Brief at pp.1-16.

32. <u>Second</u>, BMB argued that Commerce should revise its deduction for the late penalty fee to include the total paid by BMB because the terms and conditions of the late delivery penalty were established and known to all parties at the time of sale and the penalty paid by BMB qualified as a post-sale price adjustment under Commerce's practice. *See* BMB's Case

14

Brief at pp.16-26.

33. <u>Third</u>, BMB argued that there is no PMS affecting the Turkish hot-rolled coil market and accordingly no adjustment to BMB's input costs is necessary and that the PMS adjustment methodology applied by Commerce in the *Preliminary Determination* was baseless and in conflict with Commerce's prior findings regarding the hot-rolled steel market in Turkey. *See* BMB's Case Brief at pp.26-32.

34. <u>Finally</u>, BMB argued that Commerce's determination that BMB's transactions with Borusan Lojistik were not at arms'-length is not supported by substantial evidence and departs from Commerce's past practice. *See* BMB's Case Brief at pp.34-40.

35. Petitioners also submitted a case brief on November 19, 2018.

36. On November 28, 2018, BMB submitted a rebuttal brief disputing, among other matters, Petitioners' argument regarding the alleged PMS in Turkey. Petitioners did not submit case briefs discussing date of sale or the penalty fees, so BMB did not address these topics in rebuttal. On November 28, 2018, Petitioners submitted a rebuttal brief addressing the arguments made by BMB in its case brief.

37. On December 11, 2018, Commerce held a public hearing to address issues raised by all parties in their case and rebuttal briefs. BMB participated in the hearing and presented arguments against Commerce's determination to use the earlier of the invoice date or the shipment date for date of sale for all of BMB's home market and U.S. sales; Commerce's determination to deny a substantial portion of the penalty paid by BMB on its home market sales to one customer; Commerce's determination that a PMS existed in Turkey; and Commerce's determination that BMB's transactions with Borusan Lojistik were not at arms'-length, among other issues.

15

## Commerce's Final Determination

38. On February 27, 2019, Commerce published its *Final Determination*. Commerce calculated a 4.55 percent weighted-average dumping margin for BMB and continued to 1) use the earlier of the invoice date or the shipment date for date of sale for all of BMB's home market and U.S. sales; 2) deduct only a portion of the penalty paid by BMB directly to the Customer for its late deliveries; 3) find that a PMS existed in Turkey and make an upward adjustment to BMB's costs equal to the CVD margin calculated in the terminated *Hot-Rolled Steel from Turkey* investigation; and 4) determine that certain of BMB's purchases of freight and warehousing services from Borusan Lojistik were not at arms'-length. *See Final Determination*; *Final Determination IDM*.

39. On April 1, 2019, Commerce released its *Amended Final Determination*. In the *Amended Final Determination*, Commerce calculated a 5.11 percent weighted average dumping margin for BMB after correcting a ministerial error that affected the deduction for home market packing expenses. *See* Memorandum to The File from Rebecca M. Janz, Senior International Trade Compliance Analyst, AD/CVD Operations, Office II, "Amended Final Determination Margin Calculations for Borusan Mannesmann Boru Sanayi ve Ticaret A.S.," (Apr. 1, 2019).

40. On May 2, 2019, Commerce published the antidumping duty order. *Large Diameter Welded Pipe From the Republic of Turkey: Amended Final Affirmative Antidumping Duty Determination and Antidumping Duty Order*, 84 Fed. Reg. 18,799 (Dep't Commerce May 2, 2019).

41. This appeal followed.

## STATEMENT OF CLAIMS

### Count One

42. Paragraphs 1 to 41 are incorporated by reference.

43. Commerce's determination to use the earlier of the invoice date or the shipment date as the date of sale, rather than the purchase order date, for all of BMB's U.S. sales is unsupported by substantial evidence and is otherwise not in accordance with law.

### Count Two

44. Paragraphs 1 to 43 are incorporated by reference.

45. Commerce's failure to include the full amount of the late delivery penalty paid by BMB, as allocated on BMB's home market sales database, as a post-sale price adjustment is unsupported by substantial evidence and is otherwise not in accordance with law.

### Count Three

46. Paragraphs 1 to 45 are incorporated by reference.

47. Commerce's determination that a PMS exists in Turkey which distorts the cost of the production of LDWP fails to address evidence on the record that the Turkish HRC market is not distorted and is unsupported by substantial evidence and is otherwise not in accordance with law.

### Count Four

48. Paragraphs 1 to 47 are incorporated by reference.

49. Commerce's methodology for applying its PMS adjustment, including its determination to adjust the reported costs of BMB's HRC purchases from all suppliers and not only from Turkish suppliers, is unsupported by substantial evidence and is otherwise not in accordance with law.

## Count Five

50. Paragraphs 1 to 49 are incorporated by reference.

51. Commerce's determination that BMB's purchases of freight and warehousing services provided by its affiliated company, Borusan Lojistik, were not at arms'-length is unsupported by substantial evidence and is otherwise not in accordance with law.

## DEMAND FOR JUDGMENT AND PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Hold unlawful Commerce's final antidumping duty determination and reverse the factual findings and legal conclusions contained therein;

b. Remand this case to Commerce for a re-determination consistent with the judgment and findings of this Court; and

c. Grant such other relief as the Court shall deem just and proper.

Respectfully submitted,

/s/ Donald B. Cameron
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Sabahat Chaudhary
Ragan W. Updegraff

MORRIS MANNING & MARTIN LLP
1401 Eye Street, NW, Suite 600
Washington, D.C. 20005

*Counsel to Plaintiff Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş.*

Dated: May 3, 2019