Slip Op. 20-4

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **BORUSAN MANNESMANN BORU SANAYI VE TICARET A.Ş.,** | |
| Plaintiff, | **Before: Jane A. Restani, Judge** |
| **AMERICAN CAST IRON PIPE COMPANY, *et al.*,** | **Consol. Court No. 19-00056** |
| Consolidated Plaintiffs, | **PUBLIC VERSION** |
| v. | |
| **UNITED STATES,** | |
| Defendant, | |
| **AMERICAN CAST IRON PIPE COMPANY, *et al.*,** | |
| Defendant-Intervenors, and | |
| **BORUSAN MANNESMANN BORU SANAYI VE TICARET A.Ş,** | |
| Consolidated Defendant-Intervenor. | |

## OPINION AND ORDER

[In an action challenging certain of Commerce's administrative determinations in an antidumping duty investigation, Commerce's Amended Final Results pertaining to Large Diameter Welded Pipe from the Republic of Turkey are sustained in part and remanded in part for reconsideration consistent with this opinion].

Dated: January 07, 2020

Julie C. Mendoza, Donald B. Cameron, R. Will Planert, Brady W. Mills, Mary S. Hodgins, Eugene Degnan, Sabahat Chaudhary, and Ragan W. Updegraff, Morris, Manning & Martin L.L.P., of Washington, D.C., for Plaintiff and Consolidated Defendant-Intervenor Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş.

Timothy C. Brightbill, Adam M. Teslik, Elizabeth S. Lee, Enbar Toledano, Maureen E. Thorzon, Laura El-Sabaawi, and Tessa V. Capeloto, Wiley Rein L.L.P., of Washington, D.C., for Consolidated Plaintiffs and Defendant-Intervenors American Cast Iron Pipe Company, Berg Steel Pipe Corporation, Berg Spiral Pipe Corporation, Dura-Bond Industries, Strupp Corporation, Greens Bayou Pipe Mill LP, JSW Steel (USA) Inc., Skyline Steel, Trinity Products LLC, and Welspun Tubular LLC.

Eric J. Singley, Trial Attorney, and L. Misha Preheim, Assistant Director, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of Washington, D.C., for Defendant United States of America.  With them on the brief were Joseph H. Hunt, Assistant Attorney General, and Jeanne E. Davidson, Director, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of Washington, D.C.  Of counsel on the brief was Reza Karamloo, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

**Restani**, **Judge**:  Before the court are motions for judgment on the agency record pursuant to USCIT Rule 56.2, in a consolidated action challenging a final determination of the United States Department of Commerce ("Commerce").  The final determination at issue results from Commerce's investigation into allegations that domestic sales of certain Large Diameter Welded Pipe ("LDWP") from the Republic of Turkey were made at less-than-fair-market-value ("LTFV") between January 1, 2017 and December 31, 2017.  See Large Diameter Welded Pipe from Canada, Greece, India, the People's Republic of China, the Republic of Korea, and the Republic of Turkey: Initiation of Less-Than-Fair-Value Investigations, 83 Fed. Reg. 7,154 (Feb. 20, 2018) ("Initiation of Investigation"); Large Diameter Welded Pipe from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value, 84 Fed. Reg. 6,362, 6,362 (Feb. 27, 2019) (the "Final Results"); Large Diameter Welded Pipe from the Republic of Turkey: Amended Final Affirmative Antidumping Duty Determination & Antidumping Duty Order, 84 Fed. Reg. 18,799, 18,799–800 (May 2, 2019) (the "Antidumping Order").

Plaintiff, Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. ("BMB"), and Consolidated Plaintiffs American Cast Iron Pipe Company ("American Cast Iron"), Berg Steel Pipe Corporation

("Berg Steel"), Berg Spiral Pipe Corporation ("Berg Spiral"), Dura-Bond Industries ("Dura-Bond"), Stupp Corporation ("Stupp"), Greens Bayou Pipe Mill LP, JSW Steel (USA) Inc. ("Greens Bayou"), Skyline Steel ("Skyline"), Trinity Products LLC ("Trinity"), and Welspun Tubular LLC ("Welspun")[1] (collectively, the "Domestic Producers"), challenge certain aspects of the <u>Final Determination</u> and the <u>Antidumping Order</u> as unsupported by substantial evidence or otherwise not in accordance with law.  Defendant, the United States of America (the "government"), asks the court to sustain the <u>Final Determination</u> and resulting <u>Antidumping Order</u>.

## GENERAL BACKGROUND

On January 17, 2018, the Domestic Producers filed antidumping duty ("AD") and countervailing duty ("CVD") petitions with Commerce and the International Trade Commission (the "Commission"), alleging, <u>inter alia</u>, that "imports of welded pipe from . . . Turkey are being, or are likely to be, sold in the United States at less than fair value," and that "such imports are materially injuring or threatening material injury to, the domestic industry producing welded pipe in the United States."  <u>Initiation of Investigation</u>, 83 Fed. Reg. at 7,155.  Commerce initiated an AD investigation of welded pipe from Turkey for the period January 1, 2017 through December 31, 2017 (the "POI").  <u>Id.</u>  After Commerce published its <u>Final Results</u>, the Commission informed Commerce that the LTFV imports of LDWP materially injure a United States industry resulting in an antidumping duty order.  <u>See</u> <u>Antidumping Order</u>, 84 Fed. Reg. at 18,799 (setting the BMB duty deposit rate at 5.11%).

---

[1] American Cast Iron Pipe Company, Berg Steel Pipe Corporation, Berg Spiral Pipe Corporation, Dura-Bond Industries, and Stupp Corporation appear individually and as members of the American Line Pipe Producers Association.  <u>See</u> Consol. Pls.' Mem. in Supp. of [their] Rule 56.2 Mot. for J. upon the Agency R. at 1, ECF No. 36 (July 15, 2019) ("Dom. Prod. Br.").

On May 2, 2019, BMB commenced the instant action against the United States pursuant to

19 U.S.C. § 1516a(a)(2)(A)(i)(II).  Summons, ECF No. 1 (May 2, 2019).  In its Complaint, BMB

claims that the Antidumping Order is unsupported by substantial evidence or is otherwise contrary

to law because Commerce determined incorrectly: (1) the dates of BMB's U.S. sales, (2) BMB's

post-sale price adjustment, (3) the applicability of and the existence of a particular market situation

("PMS") in the Republic of Turkey,  and (4) that BMB purchased its freight and related services

from an affiliate company in a non-arm's-length transaction.  Compl. ¶¶ 42–51, ECF No. 7 (May

3, 2019).

On May 29, 2019, the Domestic Producers commenced a related action against the United

States pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II).  See Am. Cast Iron Pipe Co. v. United States,

Ct. No. 19-80, Summons, ECF No. 1 (May 29, 2019).  In their Complaint, the Domestic Producers

allege that the Antidumping Order is unsupported by substantial evidence or is otherwise contrary

to law because Commerce determined incorrectly: (1) the proper methodology to adjust BMB's

reported costs due to PMS, (2) BMB's post-sale price adjustment, and (3) a reduction to BMB's

freight and warehousing services upward adjustment for U.S. sales transactions.  Am. Cast Iron

Pipe Co. v. United States, Ct. No. 19-80, Compl. ¶¶ 21–28, ECF No. 11, (June 19, 2019).  The

actions were consolidated, and BMB and the Domestic Producers now move for judgment on the

agency record on each of the foregoing issues.   See Mot. Brief in Supp. of Pl. Borusan

Mannesmann Boru Sanayi ve Ticaret A.Ş.'s ("BMB") in support of its Mot. for J. on the Agency

R. at 2, ECF No. 38 (July 15, 2019) ("BMB Br."); Dom. Prod. Br. at 2–3.  The government opposes

both motions.  See Def.'s Resp. to Pls.' Mots. For J. upon the Agency R., ECF No. 48 (Sept. 25,

2019) ("Gov. Br.").

For the reasons that follow, the court will sustain (1) Commerce's determinations that BMB is entitled to a post-sale price adjustment for certain of its home-market sales, but not the manner of calculation, and (2) Commerce's determination as to BMB's freight and related expenses for all of its sales.  The court will remand this matter to Commerce for reconsideration (1) of the date of U.S. sales and (2) the amount of the post-sale price adjustment and to eliminate any adjustment to the calculation of sales below cost of production on account of a PMS.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and section 516A of the Tariff Act of 1930 (the "Act"), codified as amended, 19 U.S.C. § 1516a(a)(2) (2012).[2]  The court sustains Commerce's results in an AD investigation unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]"  19 U.S.C. § 1516a(b)(1)(B)(i).  See also Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996).

## STATUTORY FRAMEWORK

In an AD investigation, Commerce must determine whether the subject merchandise is being sold, or is likely to be sold, at a price that is less than its fair value in the United States.  19 U.S.C. § 1675(a)(2)(A).  Where Commerce uses export price methodology for sales to the United States, as it did here, see Decision Memorandum for the Preliminary Determination in the Less-Than-Fair-Value Investigation of Large Diameter Welded Pipe from the Republic of Turkey, A-489-833, POI 1/1/2017-12/31/2017 at 5–7 (Dep't Commerce Aug. 20, 2018) ("Prelim. I&D Memo"); Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Large Diameter Welded Pipe from the Republic of Turkey, A-489-833, POI 1/1/2017-12/31/2017 at 3 (Dep't Commerce Feb. 19, 2019) ("I&D Memo"),

_____

[2] Further citations to the United States Code are to the 2012 edition unless otherwise indicated.

Commerce must make a "fair comparison" between "the export price" (i.e., the price at which the subject merchandise is first sold in the United States) and "normal value" (i.e., the price at which the subject merchandise is sold in the exporting country, or the "home market") to ascertain whether an importer is dumping its goods in the United States. 19 U.S.C. §§ 1677a and 1677b. This results in the Less Than Fair Value ("LTFV") margin used in duty assessment. Commerce may use sales to third countries or constructed value if the pool of usable home market sales is insufficient for comparison purposes. 19 U.S.C. § 1677b(a). For home-market sales, which Commerce used here to calculate normal value ("NV"), the price used is the price "for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price[.]" 19 U.S.C. § 1677b(a)(1)(B)(i).

The "normal value" of such merchandise equals the price "at a time reasonably corresponding to the time of the sale" that Commerce uses "to determine the export price." 19 U.S.C. § 1677b(a)(1)(A). Nevertheless, where Commerce "has reasonable grounds to believe or suspect" that the home market price used to calculate normal value "represent[s] less than the cost of production of that product," Commerce must determine whether the sales are "made at less than the cost of production" and remove such sales from the pool of home market sales. 19 U.S.C. § 1677b(b)(1). It did so as to some home market sales, but only after adjusting them downward for a PMS. This created one point of contention here, along with the choice of sales date for U.S. destined sales to be compared to NV sales. The date of sale is important because it establishes which sales are within the POI and the date of currency conversion for home-market sales. Thus, if the date of sale for exports to the United States is incorrect, there will not be a proper timeframe comparison with NV.

The final issues concern statutory adjustments up or down to NV pursuant to 19 U.S.C. § 1677b(a)(6).

## DISCUSSION

### I.      Determination of the Dates of BMB's U.S. Sales

#### a.      Background

Commerce used the dates of invoice to determine the dates of sale for two of BMB's sales to U.S. customers and not the dates of the final purchase orders for those sales. See Prelim I&D Memo at 20; I&D Memo at 16.  BMB's challenge to Commerce's determination is two-fold.  First, BMB contends that Commerce acted contrary to law because Commerce did not consider that the two sales contracts at issue are long-term supply contracts involving custom goods.  BMB Br. at 14–15.  Second, BMB claims that Commerce's determination is unsupported by substantial evidence because all of the material terms of the sales contracts were established as of the date of the respective final purchase orders, both of which pre-date their invoice dates.  Id. at 15–22.  The Domestic Producers and the government respond that Commerce's use of the invoice date is both supported by substantial evidence and otherwise in accordance with law.  See Def.-Intervenors' Resp. to Pl.'s Mot. for J. on the Agency R. at 2–11, ECF No. 50 (Sept. 26, 2019) ("Dom. Prod. Resp. Br."); Gov. Br. at 5–8.  They aver that Commerce applied the applicable regulation appropriately and that BMB failed to meet its burden to show that the purchase order dates were the better dates to apply under the circumstances.  Dom. Prod. Resp. Br.at 2–11; Gov. Br. at 5–8.  For the reasons that follow, the court concludes that Commerce's decision to use the invoice date as the date of sale for BMB's U.S. sales is unsupported by substantial evidence or otherwise contrary to law, and will remand this issue to Commerce for proper application of the law and reconsideration.

    b.    Dates of U.S. Sales were not properly determined

The governing statute does not specify the method by which Commerce must determine

the date of sale for the purposes of determining the normal value of the merchandise subject to a

LTFV investigation.    Nevertheless, the Statement of Administrative Action ("SAA")

accompanying the Uruguay Round Agreements Act defines "date of sale" as "a date when the

material terms of sale are established."   See Uruguay Round Agreements Act, Statement of

Administrative Action, ("SAA") H.R. Rep. No. 103-316, vol. 1, at 810 (1994), reprinted in 1994

U.S.C.C.A.N. 4040, 4153.  Further, Commerce's regulations provide that

> In identifying the date of sale of the subject merchandise or foreign like product,
> [Commerce] normally will use the date of invoice, as recorded in the exporter or
> producer's records kept in the ordinary course of business. However, [Commerce]
> may use a date other than the date of invoice if [Commerce] is satisfied that a
> different date better reflects the date on which the exporter or producer establishes
> the material terms of sale.

19 C.F.R. § 351.401(i) (2018).[3]  Thus, under ordinary circumstances, the date-of-sale regulation

"establishes a 'rebuttable presumption' in favor of the invoice date unless the proponent of a

different date produces satisfactory evidence that the material terms of sale were established on

that alternate date."   Ereğli Demir ve Çelik Fabrikalari T.A.Ş. v. United States, 308 F. Supp. 3d

1297, 1306 (CIT 2018) (citations omitted).

    During the investigation, BMB pointed Commerce to specific provisions within

Commerce's 1997 rule promulgation, wherein Commerce explained that the "date of invoice"

presumption would not apply to long-term contracts.  See Case Br. of Borusan Mannesmann Boru

---

[3] Further citations to the Code of Federal Regulations are to the 2018 edition unless otherwise
indicated.

Sanayi ve Ticaret A.Ş. at 6, C.R. Doc. 498, P.R. Doc. 281,[4] (Nov. 19, 2018) ("BMB Case Br.")

(citing Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,350 (Dep't

Commerce May 19, 1997) (the "Preamble")).[5]  Further, the Preamble provides that, absent certain

exceptions, Commerce "will use a date other than the date of invoice" for open-ended sales

involving custom-made goods.  Preamble, 62 Fed. Reg. at 27,349.  In a separate section of the

Preamble, Commerce explained as follows:

> Because of the unusual nature of long-term contracts, whereby merchandise may
> not enter the United States until long after the date of contract, the Department will
> continue to review these situations carefully on a case-by-case basis. . . . [The] date
> of invoice normally would not be an appropriate date of sale for such contracts.
> The date on which the material terms of sale are finally set would be the appropriate
> date of sale for such contracts.

Preamble, 62 Fed. Reg. at 27,350.[6]

During the investigation, BMB explained, and presented Commerce with evidence

demonstrating that, the final purchase orders at issue involved specialized products and spanned

multiple years, and thus BMB claimed that they were long-term contracts involving custom goods.

BMB Case Br. at 7–9 (citing BMB's Suppl. Sections A & C Questionnaire Resp., C.R. 155–160,

P.R. 135–138, at A-36–38 (May 7, 2018)).  BMB argued that the final purchase orders were

binding as of the date of execution, the parties performed their mutual obligations in accordance

with the purchase orders' terms, and there were "no changes to the essential terms of sale after the

---

[4] "P.R." refers to a document contained in the public administrative record. "C.R." refers to a
document contained in the confidential administrative record.

[5] Before 1997, Section 351.401(i) did not exist.  See 19 C.F.R. § 353.2(t) (1996) (providing no
definition for "date of sale," but defining "sale" to include "a contract to sell and a lease that is
equivalent to a sale" and defining a "likely sale" as "a person's irrevocable offer to sell").

[6] Commerce saw no "need for a separate provision addressing long-term contracts," because it
believed that 19 C.F.R. § 351.401(i) was "sufficiently flexible."  Preamble, 62 Fed. Reg. at 27,350.

date of the final purchase order."  Id. at 9.  BMB further explained that although BMB and its

customers amended the purchase orders over the course of several years, "the contracting parties

had the expectation at the time of signing the purchase order/contract that the essential terms of

sale were fixed[.]"  Id.  BMB explained that none of the material terms could change after the initial

purchase order was executed without all parties' consent, and that the purchase orders were "long

term contract[s] where shipments entered long after the conclusion of the contract[s]."  Id. at 2.

The parties agree that BMB and its U.S. customers amended their purchase orders frequently, but

they dispute whether the interim changes to the purchase orders affected material terms, what

presumptions as to date of sale apply, and when the contracts were no longer subject to change.

See BMB Br. at 14–15; Dom. Prod. Br. at 2–5; Gov. Br. at 8–12.

In the Final Determination, Commerce concluded that BMB failed to produce satisfactory

evidence that the final purchase orders were not subject to change, and so instead used the invoice

date as the date of sale.  I&D Memo at 13–14.  Commerce found that BMB's evidence showed

that "revisions to the purchase orders involved the prices, quantities, and delivery terms, all of

which constitute changes to the material terms of sale."  Id. at 14.  Commerce concluded that BMB

necessarily failed to show that "the material terms of the purchase order were fixed and established

. . . until [BMB] either shipped the product or issued an invoice with the final terms to the

customer."  Id. at 14.

The omission on Commerce's part is that it did not truly grapple with the issues of whether

the contracts were long term or involved additional proprietary specifications beyond ordinary

pipe specifications and thus whether they were custom goods.  It appears that under Commerce's

regulations either situation, long-term contract or custom goods, will avoid the presumption in

favor of invoice date.  In either circumstance, Commerce must focus on when all of the

circumstances that indicate no further change was likely and the material terms essentially were set.

For the two projects in the United States for which BMB sold pipe, no changes to the asserted final purchase order were made during the POI and for at least one of the projects the fabrication of the merchandise was complete, and the merchandise was delivered to the port, awaiting loading into a vessel, all in the year before the POI.  See BMB Br. at 4–5.  Further, the invoice was required to be delayed.  See id. at 4.  It would appear that the actual fact of no further changes, between the claimed date of sale or shipment and invoice would be one consideration, but whether that should be determinative or not is for Commerce to explain.  But the date at which no further changes were realistically possible would seem to be determinative.  Here, one contract specified no changes after certain events.  See BMB Br. at 16.  Whether completed manufacture and/or delivery to the port would cause the relevant clauses to be invoked is not for the court to determine in the first instance.  Thus, Commerce shall determine if the regulatory presumption in favor of invoice date governs and shall apply presumptions and burdens accordingly.  It shall further address if the material terms of the contact were essentially fixed before invoice date so that a proper LTFV comparison can be made.

## II.     Determination of BMB's Post-Sale Downward Price Adjustment to Home-Market Sales

### a.   Background

In its Preliminary Determination, Commerce explained that it reallocated certain late penalty fees that BMB paid to a Turkish customer within its home market "to reflect the allocation stated in an agreement that pre-dates the investigation" in accordance with Commerce's "practice for post-sale price adjustments."  Prelim I&D Memo at 20.  In its Final Determination, Commerce stated that BMB shared equally in the liability for the reported late payment penalty fee pursuant

to a "2014 contract" with two other Turkish steel merchandise producers, with whom BMB did not reach a final agreement as to the final allocation of penalties until the Summer of 2018, five months after the initiation of the investigation. See I&D Memo at 19–20.  Accordingly, although Commerce adjusted BMB's post-sale price, according to Commerce the adjustment was limited to BMB's share of the late delivery penalty attributable to BMB and its affiliates, "as set forth in the contract with the [Customer]." Id. at 21.  Commerce determined the total penalty fee [[

           ]], and Commerce limited BMB's allowed liability to one-third of this amount, presumably because there were three members of the consortium. Id. at 20 (citing BMB's Prelim. Sales Calculation Mem., C.R. 333, P.R. 248 (Dep't Commerce Aug. 20, 2018)) ("Prelim. Sales Calculation Mem.").  BMB challenges Commerce's determination as unsupported by substantial evidence and as otherwise contrary to law, claiming that Commerce incorrectly calculated the total penalty amount and the amount BMB is obligated to pay. BMB Br. at 28, 32.  The Domestic Producers likewise challenge Commerce's determination as unsupported by substantial evidence and as otherwise contrary to law but claim that BMB is not entitled to any post-sale price adjustment. Dom. Prod. Br. at 25.  In their view, Commerce should have applied an "adverse-facts-available" ("AFA") inference[7] in making its calculations because BMB was not forthcoming about its liabilities during the investigation. Dom. Prod. Br. at 25.  The government asks the court

---

[7] In AD/CVD investigations, if Commerce determines that there is a gap in the record, it may use facts otherwise available to render its decision. See 19 U.S.C. § 1677e(a).  If a party fails to cooperate "to the best of its ability," then Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b).  This is known as applying "adverse facts available," or "AFA."  The decision to apply AFA is within Commerce's discretion and Domestic Producers have not shown an abuse of discretion, as reflected in the text. See, e.g., Changzhou Trina Solar Energy Co. v. United States, 255 F. Supp. 3d 1312, 1317 (CIT 2017).  Accordingly, the court rejects the Domestic Producers' request to require Commerce to apply AFA to BMB in this case.

to sustain Commerce's decision to grant BMB a post-sale price adjustment and calculation of that adjustment.  Gov. Br. at 33.

In Autumn 2013, BMB and two other Turkish LDWP producers (the "Consortium Members") [8] entered into an agreement wherein each agreed to submit a bid on a pipeline project of a Turkish enterprise. [9]  See BMB's Resp. to Commerce's Suppl. Sections A–C Questionnaire, C.R. 200–225, P.R. 173–174, Ex. A-41 (June 15, 2018), (the "Joint Venture Agreement").  The Joint Venture Agreement recognized joint and several liability among all of the Consortium Members.  Id. It also provided:

[[



                                                                          ]].

Id. (emphases added).  The Consortium Members entered into a subsequent agreement wherein they agreed to share equally in the "[a]ward" of the project and in its "responsibilities and requirements."  See Submission of Field No. 38.0 (Direct Selling Expenses) Documentation from BMB's Second Suppl. Resp. to Sections A–C Questionnaire, C.R. 280–288, P.R. 180, Ex. B-32 ("BMB Ex. B-32") at Consortium Agreement (July 6, 2018) (the "Consortium Agreement").

In Autumn 2014, the Consortium Members, as Vendors, entered into a contract with the Client that specified liquidated damages for delay.  See BMB Ex. B-32 at "Procurement Contract

---

[8] The Consortium Members are (1) BMB, (2) [[                                          ]], (3) and [[                                        ]], all of which are Turkish companies.

[9] [[                                        ]], is referred to as client, customer, or employer. See Joint Venture Agreement.

relating to the Supply of Line Pipes and Hot Bends for [Project]" (Oct. 14, 2014) (the "Sales Contract").  The relevant provisions of the Sales Contract provide that

  [[

                      ]]

Sales Contract §§ 8.2.1–2.  In early Spring 2016, BMB began to incur a delay penalty for late deliveries pursuant to the Sales Contract.  BMB Case Br. at 20.  Two years later, the Client sent the Consortium Members a Notice of Penalty, wherein it demanded a substantial sum [[

    ]] for delay penalties pursuant to the Sales Contract.  See BMB's Resp. to Commerce's Suppl. Sections A–C Questionnaire, C.R. 220–225, P.R. 173–174 Exhibit B-28 at "May 28, 2018 Resp. to 48" and 56" Line Pipe Delay Liquidated Damages" (May 28, 2018) ("Notice of Penalty").  Fewer than two weeks later, the Consortium Members tendered a counter-offer [[  ]] in full and final satisfaction of the Client's claim for penalty delay liquidated damages.  See id. at "Consortium June 11, 2018 Resp. to Line Pipe Delay Liquidated Damages Confirming Total Penalty" (June 11, 2018) ("Consortium Counter-Offer").  The parties agree that in the Summer of 2018, the Consortium Members and the Client agreed to the counterclaim amount [[   ]], of which BMB was liable for the largest part [[     ]].  See BMB Br. at

6 (citing <u>Consortium Agreement</u>; BMB Ex. B-32. at "Protocol" (Nov. 11, 2018) ("<u>Settlement</u> <u>Agreement</u>")); Gov. Br. at 6–7; Dom. Prod. Br. at 22–23.[10]

BMB claims that it disclosed the total penalty amount to Commerce in its "home market sales database" during the investigation and insists that Commerce should have used its actual share of the full penalty amount to calculate the adjustment. <u>See</u> BMB Br. at 25–28. The record shows that BMB disclosed the existence and nature of these expenses. <u>See</u> BMB's Resp. to Sections B-D of Initial Antidumping Duty Questionnaire, C.R. 58–94, P.R. 100–105, at B-47 (Apr. 23, 2018) ("BMB's B-D Resp."). Specifically, BMB reported the total amount owed the Client per the <u>Settlement Agreement</u>, pursuant to a "disputed penalty for late delivery on sales to [that customer]" during 2016 and 2017. <u>Id.</u> at B-48. Further, BMB claims that the agreements setting forth the allocation of the late penalty fee "were executed well before the investigation." BMB Br. at 6, <u>see also</u> <u>BMB's Case Br.</u> at 16–17. Before Commerce, BMB explained that "individual [C]onsortium [M]embers were jointly and severally liable as to [the Customer] but also liable to each other" pursuant to the indemnification clause in the <u>Joint Venture Agreement</u>. <u>BMB Case</u> <u>Br.</u> at 19 (citing <u>Joint Venture Agreement</u> § 6 ¶ 2). Nonetheless, Commerce ultimately explained that "[t]he changing terms of the late penalty fee after the initiation of the investigation casts significant doubt on the legitimacy of the allocation of this expense among the consortium members." <u>I&D Memo</u> at 19.

For their part, the Domestic Producers contend that "the record fails to make the necessary connection between [BMB]'s [home market] sales and the penalty to warrant an adjustment."

---

[10] The government and the Domestic Producers aver that the <u>Joint Venture Agreement</u> is merely a separate agreement of which [[    ]] had no knowledge at the time of sale. Gov. Br. at 37; Dom. Prod. Br. at 24. These positions are untenable in the light of the express language of the <u>Sales</u> <u>Contract</u>, which expressly incorporates the <u>Joint Venture Agreement</u> by reference. <u>Sales Contract</u> § 25.9.

Dom. Prod. Br. at 24.   In particular, they argue that BMB "failed to demonstrate how it was

responsible for [              of] the penalties that the Consortium assigned to BMB or how [the

penalties applied to its subject merchandise]." Id.  According to the Domestic Producers, BMB

was not forthcoming about its status as a Consortium Member and its submissions to Commerce

lacked any factual support, so that "Commerce should have applied 'partial adverse facts available

("AFA")'" to BMB to deny any post-sales cost adjustment. Id. at 25.  In the alternative they

support Commerce's allocation. Id. at 27–29.

> b. Commerce's decision to grant BMB a post-sales price adjustment is supported
>    by substantial record evidence and is not contrary to law.

The governing Regulations provide that a "price adjustment" is "a change in the price

charged for subject merchandise . . .  such as a discount, rebate, or other adjustment, including,

under certain circumstances, a change that is made after the time of sale, that is reflected in the

purchaser's net outlay." 19 C.F.R. § 351.102(b)(38) (emphasis added). [11]  A party "seeking a post-

---

[11] In 2014, the Court of International Trade concluded that Commerce's "decision not to recognize
as 'price adjustments' the payments made to home market customers on a monthly basis was
contrary to the Department's regulations, which are controlling on the issue presented and are
binding on the court as well as the Department." Papierfabrik August Koehler AG v. United States,
971 F. Supp. 2d 1246, 1258 (CIT 2014). At the time, 19 C.F.R. § 351.102(b)(38) (2014) defined
"price adjustment" as "any change in the price charged for subject merchandise . . . such as
discounts, rebates and post-sale price adjustments, that are reflected in the purchaser's net outlay."
Additionally, section 351.401(c) provided that Commerce "will use a price that is net of any price
adjustment . . . that is reasonably attributable to the subject merchandise[.]"  Id. § 351.401(c)
(2014) (emphasis added).
    In response to Koehler, Commerce published a final rule modification of sections
351.102(b)(38) and 351.401(c) to clarify "that the Department generally will not consider a price
adjustment that reduces or eliminates a dumping margin unless the party claiming such price
adjustment demonstrates that the terms and conditions of the adjustment were established and
known to the customer at the time of sale."  Modification of Regulations Regarding Price
Adjustments in Antidumping Duty Proceedings, 81 Fed. Reg. 15,641, 15,642 (Dep't Commerce
Mar. 24, 2016) ("Final Modification"). Section 351.102(b)(38) now provides that "under certain
circumstances," a "price adjustment" may include "a change that is made after the time of sale,
that is reflected in the purchaser's net outlay." 19 C.F.R. § 351.102(b)(38) (2018).  Additionally,
section 351.401(c) now explains that Commerce "normally will use a price that is net of [certain]

sale price adjustment to normal value bears the burden of establishing its entitlement to such

adjustment." Jindal Poly Films Ltd. of India v. United States, 365 F. Supp. 3d 1379, 1387 (CIT

2019) (citing Fujitsu Gen. Ltd., 88 F.3d at 1040).

To ascertain whether a party has met its burden to show entitlement to a post-sale price

adjustment, Commerce may consider "any one or a combination of" certain factors, and in all

cases, Commerce will make its determination "on a case-by-case basis and in [the] light of the

evidence and arguments on each record." Final Modification, 81 Fed. Reg. at 15,645. These

factors, set forth in the Preamble, include:

> (1)   Knowledge (i.e., whether the customer had knowledge of the terms and conditions
>        of the adjustment at the time of sale, and whether this knowledge is documented in
>        a writing),
>
> (2)   Commonality (i.e., whether the requested post-sale price adjustments are common
>        for the respondent company, its industry, or both),
>
> (3)   Timing (i.e., whether the timing of the requested price adjustment is reasonable in
>        view of all pertinent circumstances of record),
>
> (4)   Numerosity (i.e., whether the number of requested post-sale price adjustments is
>        reasonable in view of all pertinent circumstances of record), and
>
> (5)   Other (i.e., "any other factors tending to reflect on the legitimacy of the claimed
>        adjustment.").

Id. at 15,644–45.   While the party seeking the adjustment bears the burden of production,

Commerce likewise must ensure that the party "has sufficient notice of what information is

considered necessary to allow it to meet that burden." Jindal Poly, 365 F. Supp. 3d at 1387.

---

price adjustments . . . that are reasonably attributable to the subject merchandise," and provides
that Commerce "will not accept a price adjustment that is made after the time of sale unless the
interested party demonstrates, to the satisfaction of [Commerce], its entitlement to such an
adjustment." 19 C.F.R. § 351.401(c) (emphasis added).

Commerce "may not fail to engage with a respondent attempting to address the [Final Modification] factors in good faith." Id.  The court addresses each relevant factor in turn.[12]

### 1.    Knowledge

Commerce determined that although a late penalty liability was contracted for, neither the Joint Venture Agreement nor the Sales Contract demonstrate sufficiently that the Turkish customer had knowledge of the method by which the Consortium Members would divide any late penalty fee among themselves at the time of sale, "because the parties negotiated their shares of the fee after the fee was imposed." I&D Memo at 19.  At verification, Commerce received evidence that the Consortium Members did not finally apportion their respective shares of the late penalty fee until after the fee was imposed in June 2018. Id.  This is not disputed.

BMB argues whatever happened in June 2018, the Joint Venture Agreement and the Sales Contract set forth the terms and conditions of the post-sale price adjustment, which were known to the parties at the time of sale.  Reply Br. of Pl. Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. in Supp. of its Mot. for J. on the Agency R., ECF No. 58, at 15 (Oct. 16, 2019) ("BMB Reply").  According to BMB, these terms and conditions "were set before the investigation," so that "Commerce's failure to make a post-sale price adjustment for the full amount of the liquidated damages penalty actually paid by BMB on these home market sales is contrary to law."  BMB Br. at 24.  The record contains a significant amount of documentation that supports BMB's position. First, BMB points to the Sales Contract, to which the Consortium Members and [the Turkish Customer] are parties.  BMB Br. at 25. The Sales Contract expressly incorporates the Joint Venture Agreement by reference, see Sales Contract § 25.9.  Second, BMB points to the Joint Venture Agreement which, by its text, apportions joint and several liability to the Customer, and also seems

---

[12] Numerosity was not discussed by the parties.

to provide that a breaching Member shall compensate the other Members for the portion of the penalties for which it is responsible.  BMB Br. at 25–28.

Thus, while the government and Domestic Producers are correct that the <u>Settlement Agreement</u> dated in the Summer of 2018 is the first document to set forth the precise sums due the Client from each Consortium Member, that is not necessarily determinative, because even Commerce's own explanation of the Final Modification merely requires a claimant to prove that a customer had knowledge of the terms and conditions governing the adjustment at the time of sale. <u>Final Modification</u>, 81 Fed. Reg. at 15,644–45.  There is no specific requirement that the final quantity of that adjustment be known in advance.  <u>Id</u>.  Accordingly, Commerce's conclusion that BMB failed to demonstrate the Client's knowledge of the relevant "terms and conditions" is incorrect.

### 2.  Timing

Commerce explained that BMB did not address any of the "other factors that Commerce may consider in deciding whether a respondent is entitled to a post-sale price adjustment," including "the timing of the allocation of the penalty among the [C]onsortium [M]embers."  <u>I&D Memo</u> at 19.  This explanation is also incorrect, because BMB addressed each of the relevant factors in its Case Brief.  <u>See</u> <u>BMB Case Br.</u> at 23–26.  The problem here is that the Consortium Members did not finally agree on their respective liabilities for the penalty until months after Commerce initiated its investigation.  <u>I&D Memo</u> at 19.  Commerce found this timing to be dubious.  <u>Id.</u> at 20.  The government submits that Commerce has "consistently applied a practice of denying post-sale price adjustments where the terms and conditions" of an otherwise deductible adjustment "were not established and known to the customers at the time of sale," citing Commerce's concern that foreign producers might manipulate dumping margins by claiming <u>post</u>

hoc price adjustments.  Gov. Br. at 34 (citations omitted).  As the court has explained, however, the Sales Contract (i.e., the document upon which Commerce purported to rely in its calculation) pre-dates the investigation by four years, as does the Joint Venture Agreement.  Thus, the issue is whether the allocation itself is dubious, not the penalty liability.

### 3.  Commonality

BMB presented Commerce with evidence demonstrating that long-term contracts between suppliers and purchasers are common practice in the Turkish steel industry.  See BMB Case Br. at 24–25.  Rejecting these exhibits, Commerce explained that in the Final Modification, it "explicitly declined to accept post-sale price adjustments merely because a company can demonstrate that the adjustment is part of its standard business practices that existed" before the investigation.  I&D Memo at 20 (citing Final Modification, 81 Fed. Reg. at 15,645).  It is unclear what effect this denial had and Commerce did accept that a substantial post-sale penalty was incurred.

### 4.  Other

Notwithstanding the foregoing, Commerce may consider "any one or a combination of" the foregoing factors, in addition to "any other factors tending to reflect on the legitimacy of the claimed adjustment."  Final Modification, 81 Fed. Reg. at 15,645.

In this case, the government avers that BMB "changed its story repeatedly throughout the [investigation]; at times significantly with little or no explanation."  Gov. Br. at 37–38.  The government points to BMB's initial questionnaire responses from April 2018, wherein BMB generally reported several direct selling expenses on its home-market sales, "including a disputed penalty for late delivery on sales to" the Client.  Id. at 38 (citing BMB's B-D Resp. at B-47–48).  Therein, BMB reported that it agreed to pay the Client the full amount of the penalty (i.e., [[

]]).  <u>See</u> BMB's B-D Resp. at B-47–48.  Two months later, BMB disclosed that it was a member of a Consortium and disclosed the <u>Joint Venture Agreement</u>, the <u>Consortium Agreement</u>, the <u>Sales Contract</u>, and the <u>Settlement Agreement</u>.  <u>Id.</u> (citing BMB's Suppl. Questionnaire Resp. Sections A–C at 17–20, Exhibits B-28–29).  The government explains that Commerce apportioned BMB's liability at one-third of the total penalty, pursuant to "the 2014 contract" with the Client (<u>i.e.</u>, the <u>Consortium Agreement</u>) because, in Commerce's view, the terms of the late penalty fee kept changing "after the initiation of the investigat[ion]."  Gov. Br. at 38.  Yet, the government concedes that Commerce independently verified BMB's post-sale price adjustment based upon information that BMB placed on the record.  <u>Id.</u> at 41.

The government also contends that BMB failed to exhaust its administrative remedies because BMB did not request a "full post-sale price adjustment" before Commerce.  <u>Id.</u> at 39 (emphasis omitted).  This contention is meritless.  It is clear that BMB sought a direct selling expense deduction for "the entire penalty amount paid by BMB" as a post-sale price adjustment.  <u>BMB Case Br.</u> at 18.  As to the Domestic Producers' arguments that application of AFA was required, the government responds that "Commerce reasonably determined that there was no factual basis to conclude that [BMB] failed to cooperate to the best of its ability as required to apply AFA."  Gov. Br. at 41.  According to the government, Commerce determined that BMB responded to Commerce's requests for information, placed the information on the record, and Commerce thereafter verified the information.  <u>Id.</u>  The government further contends that Commerce did not err in granting BMB a partial post-sale price adjustment because the "adjustment was consistent with the terms of the 2014 contract, which indicated that the total amount owed the customer was subject to negotiation."  <u>Id.</u> at 42.  Furthermore, according to the government, Commerce verified the total amount of the penalties and found no discrepancies.

Thus, the manner in which all information finally reaches Commerce adds nothing to the resolution of the allocation problem.

The Domestic Producers' other argument to disallow an adjustment for the penalties paid also fails. Their claim that "the record fails to make the necessary connection between [BMB]'s [home market] sales and the penalty to warrant an adjustment" is without merit. Dom. Prod. Br. at 24. Plainly, BMB, a Turkish company, in a joint venture with two other Turkish companies, sold LDWP in Turkey to a third-party Turkish client in 2016 and 2017. It is also clear from the record that BMB timely complied with Commerce's requests for additional information. Indeed, Commerce explains that it "verified the total amount of penalties associated with sales to [the Customer] during the" period of investigation "and noted no discrepancies." I&D Memo at 21. Accordingly, the court agrees with Commerce and BMB that a post-sale adjustment is proper. The court understands Commerce's reluctance to except a final allocation that wasn't known until the investigation commenced. Had BMB not been involved in a joint venture, however, it appears that Commerce would have accepted the full penalty adjustment. It is always an uncertainty for this kind of adjustment that cannot be finally known until after a sale is completed, and that uncertainty is exacerbated by the ability of the Consortium Members to control the final outcome. Nonetheless, Commerce points to nothing that suggests an improper manipulation of the adjustment. Further, an equal allocation among Consortium Members is not supported by the contract documents. Had BMB incurred less than one-third of the total penalty liability one cannot imagine Commerce adopting this allocation.

The court leaves it to Commerce to review the penalty documents and to allow a post-sale adjustment for whatever amount BMB established it was liable for and actually paid or was

credited, as authorized by the pre-investigation contract obligations, unless Commerce has

evidence not previously cited that shows an improper allocation occurred.

III.    **Costs of Production may not be adjusted for a Particular Market Situation under 19 U.S.C. § 1677b(b), sales below Cost of Production**

a.  BMB's failure to raise this issue before Commerce does not constitute a failure to exhaust its administrative remedies because the issue is a pure question of law.

In an action challenging Commerce's final results in an unfair trade matter, the court "shall,

where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d)

(emphasis added).   In this context, whether a party is required to exhaust its administrative

remedies is within the court's sound discretion.   See, e.g., Apex Frozen Foods Private Ltd. v.

United States, 862 F.3d 1322, 1332 (Fed. Cir. 2017); Agro Dutch Indus., Ltd. v. United States, 508

F.3d 1024, 1029 (Fed. Cir. 2007); Corus Staal BV v. United States, 502 F.3d 1370, 1381 (Fed. Cir.

2007).  Although "[r]equiring exhaustion can protect administrative agency authority and promote

judicial efficiency," Itochu Bldg. Prods. v. United States, 733 F.3d 1140, 1145 (Fed. Cir. 2013)

(citing McCarthy v. Madigan, 503 U.S. 140, 145 (1992)), the Federal Circuit has recognized a

"pure legal question" exception to the exhaustion doctrine.  See, e.g., Agro Dutch Indus., 508 F.3d

at 1029 (citations omitted).  Thus, "where the issue for the court is a 'pure legal question of law

that can be addressed without further factual development or further agency exercise of

discretion," as here, "requiring exhaustion may serve no agency or judicial interest, may cause

harm from delay," and is often inappropriate.  Itochu Bldg. Prods., 733 F.3d at 1146. Requiring

the exhaustion of remedies is particularly inappropriate where the question presented is one of

statutory construction that requires no resort to the agency record for resolution.  See, e.g., Soc

Trang Seafood Joint Stock Co. v. United States, 321 F. Supp. 3d 1329, 1341 n.18 (CIT 2018);

GGB Bearing Tech. (Suzhou) Co., v. United States, 279 F. Supp. 3d 1233, 1250 (CIT 2017).

BMB concedes that it failed to raise the issue of the proper interpretation of 19 U.S.C.

§ 1677b(b) before Commerce.  BMB Br. at 35 n.13.  The government contends that the issue "is

not purely legal, but instead involves Commerce's selection of an appropriate methodology in

administering the statute when a particular market situation exists."  Gov. Br. at 25.  The

government misapprehends BMB's position.  For this challenge BMB does not allege that for this

issue Commerce's decision is unsupported by substantial evidence on this record; instead, BMB's

argument is that the express terms of the statute prohibit Commerce from making any PMS

adjustment to an importer's cost of production ("COP") for purposes of the sales below COP test,

so that Commerce acted contrary to the statute, and thus contrary to law.  See BMB Br. at 32–35.

The "pure legal question" exception applies because no further factual development is required,

so that requiring exhaustion would be futile.   See Agro Dutch Indus., 508 F.3d at 1029.

Accordingly, the court concludes that BMB's failure to raise this issue before Commerce does not

preclude the court's review under these circumstances.

> b.   Commerce's decision to adjust BMB's costs of production is contrary to law.

The court will not discuss this matter in great detail as in recent and thorough opinions the

court has explained that no adjustment for a PMS is permitted for the sales below cost test. See

Husteel Co. v. United States, Slip Op. 20-2 (CIT Jan. 3, 2020); Saha Thai Steel Pipe Public Co. v.

United States, Slip Op. 19-165, 2019 WL 6997904 (CIT Dec. 18, 2019)  Briefly, in determining

that the Turkish HRC subsidies and otherwise low steel prices distorted BMB's reported

production costs, Commerce cited to Section 504 of the Trade Preferences Extension Act of 2015

(the "TPEA") for the proposition that Congress "added the concept of the term 'particular market

situation' to the definition of 'ordinary course of trade.'" I&D Memo at 13; see also 19 U.S.C. §

1677(15).[13]   Commerce then stated that the definition of "particular market situation" likewise

"applies to COP under" 19 U.S.C. § 1677b(b)(3), "through" 19 U.S.C. § 1677b(e) (calculation of

constructed value).   Id.   The government maintains that, in the light of the TPEA, the statutory

definition of normal value in 19 U.S.C. § 1677b(a)(1)(B)(i) (describing normal value price to inter

alia be based on sales in the ordinary course) "carries through to the subsection (b) normal value

provisions concerning sales below cost."   Gov. Br. at 25 (citing 19 U.S.C. § 1677b(b)(1), (3)).   The

Domestic Producers agree with the government as to Commerce's authority to make PMS

adjustments to COP under § 1677b(b) but contend that Commerce erred when it did not use their

proposed calculation methodology.   Dom. Prod. Br. at 10–19.   BMB responds that the plain

language of Section 504 "only authorizes Commerce to make adjustments to costs" when

determining normal value using a constructed value methodology, not when determining whether

to disregard sales below the cost of production under 19 U.S.C. § 1677b(b) for purposes of

determining the home market sales pool.   BMB Br. at 34.

   The TPEA amended specific subsections of the Act, and left others intact.   See Trade

Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362 (2015).   As applicable here,

Section 504 expands the discretion afforded Commerce to calculate COP when calculating a

---

[13] The section defines ordinary course of trade in relevant part:

> the conditions and practices which, for a reasonable time prior to the exportation of the
> subject merchandise, have been normal in the trade under consideration with respect to
> merchandise of the same class or kind. The administering authority shall consider the
> following sales and transactions, among others, to be outside the ordinary course of trade:
> . . .
> (C)Situations in which the administering authority determines that the particular market
> situation prevents a proper comparison with the export price or constructed export price.

19 U.S.C. § 1677(15).

constructed value.  TPEA § 504, 129 Stat. at 382, codified as amended, 19 U.S.C. § 1677b(e).  In

the TPEA, Congress chose not to amend 19 U.S.C. § 1677b(b).

> [W]here Congress includes particular language in one section of a statute but omits
> it in another section of the same Act, it is generally presumed that Congress acts
> intentionally and purposely in the disparate inclusion or exclusion.

Thomas v. Nicholson, 423 F.3d 1279, 1284 (Fed. Cir. 2005) (citations and quotations omitted).

Because Commerce's adjustments to BMB's COP were only for the purpose of the sales below

cost of production test, Commerce's adjustments on account of a PMS in this case are contrary to

law.  There are also claims, now mooted, by the Defendant-Intervenor that the Government's

methodology did not adequately adjust for the PMS and for its part plaintiff argues there was no

PMS, at all.  The court will not address plaintiff's claim that a PMS does not exist because the two

statutory provisions that permit consideration of a PMS were not utilized here by Commerce.  First,

Commerce did not employ the definition of ordinary course of trade in 19 U.S.C. § 1677(15) to

exclude from the pool of home market sales, sales that would distort the LTFV comparison because

of the presence of a PMS.[14]  Second, Commerce did not find the pool of home market sales

insufficient for LTFV comparison purposes.  This is the situation in which Commerce may adjust

COP on account of a PMS in calculating constructed value under 19 U.S.C § 1677b(a)(4) and (e)

to obtain a substitute NV.  The adjustment on account of the alleged PMS in this case was not

made in either of these situations.  That ends the analysis.

### IV.    Commerce properly calculated BMB's Freight and Related Services Adjustments.

---

[14] How factors such as domestic subsidies or a world-wide steel glut would distort the LTFV
comparison was not explained in this record. On their face these factors would seem to affect all
Turkish pipe production, whether for the home market or export. Further, what makes these
factors "particular" was not explained. Moreover, government control of steel production and
governmental subsidies are generally addressed through CVD, not AD, investigations.

a.   Background

To determine the normal value of BMB's costs of production, Commerce explained that it compared the prices that BMB was charged by unaffiliated parties with those charged by Borusan Lojistik ("BL"), an affiliated home-market supplier of freight and related services.  Prelim. I&D Memo at 20; I&D Memo at 23.  Commerce "made deductions, where appropriate, from the starting price for billing adjustments" and "for moving expenses, including inland freight and handling charges."  Id. (citing 19 U.S.C. § 1677b(a)(6)(B)(ii); 19 C.F.R. § 351.401(c)).  Commerce also made the required upward adjustment to NV for service on sales to the United States as required by 19 U.S.C. § 1677b(b)(A).  Id.  In practical terms, the expenses are offset against each other so that the LTFV comparison is not skewed.

In its Final Determination, Commerce refined its adjustment and explained that to determine "whether to use transactions between affiliated parties, [its] practice is to compare the transfer price either to prices charged to other unaffiliated parties who[se] contract is for the same service or prices for the same service paid by the respondent to unaffiliated parties."  I&D Memo at 23 (citing Certain Tapered Roller Bearings from the Republic of Korea: Final Determination of Sales at Less Than Fair Value, 83 Fed. Reg. 29,092 (Dep't Commerce June 22, 2018)).  Commerce concluded that for its home market sales, BMB "failed to demonstrate that its freight services from Borusan Lojistik were provided at arm's length."  Id. at 23.  Accordingly, in some cases, it used charges from an unaffiliated entity rather than the affiliated party's charges.  Id. at 24.

During the investigation, BMB reported that its "home market sales are made on a delivered basis or FOB basis."  BMB's B-D Resp. at B-38.  BMB claimed that "[f]reight is provided by Borusan Lojistik . . . or by unaffiliated freight companies" and that its reported freight charge "is based on the freight invoice from the freight company to BMB."  Id.  BMB explained

that it could not correlate its freight invoices to specific sales invoices, so that it was unable to

"calculate an invoice specific freight expense for sales" to certain customers.  Id.  Thus, BMB

"reported an average freight expense by customer and delivery location."  Id.  BMB claims that

Commerce's approach to this inquiry historically has been "to investigate BMB's course of

dealings with [BL]" to ascertain whether, in fact, the parties engaged in a non-arm's length

transaction.  BMB Br. at 40.  BMB contends that Commerce applied an "entirely new test" to

determine whether its transactions with BL were at arm's-length.  Id. (citing Antidumping

Proceedings: Affiliated Party Sales in the Ordinary Course of Trade, 67 Fed. Reg. 69,186 (Nov.

15, 2002) ("AP Rulemaking"))).

      According to BMB, "Commerce has never used this 'test' before in any of BMB's past

cases" to ascertain whether a sale with its affiliate, BL, is an arm's-length transaction.  Id.

Accordingly, BMB challenges Commerce's determination that its freight and related services

transactions with BL were not at arm's-length is unsupported by substantial evidence and is

otherwise contrary to law.  BMB Br. at 39–42.  The Domestic Producers agree that Commerce's

determination of the downward adjustment for home market sale was correct but object to the

lowering of the upward adjustment for U.S. sales.  See Dom. Prod. Br. at 30–32.

     b.  Commerce did not act contrary to law when it applied its "arm's-length test" to
        ascertain whether certain of BMB's home-market transactions with BL were not at
        arm's-length.

      Commerce may disregard any home-market transaction that is "directly or indirectly

between affiliated persons" if any element of value that Commerce considers "does not fairly

reflect the amount usually reflected in sales of merchandise under consideration" in the home

market.  19 U.S.C. § 1677b(f)(2).  As stated in Mid Continent Steel & Wire, Inc. v. United States,

219 F. Supp. 3d 1326, 1349 (CIT 2017), "[t]he statute does not define what it means for affiliated

party transactions to not fairly reflect an arm's-length transaction."  While a non-arm's-length

transaction is likely always an affiliated transaction, the converse is not necessarily true.[15]  The

applicable Regulation is clear that a transaction between affiliated parties is outside the "ordinary

course of trade" only if the "merchandise is sold to an affiliated party <u>at a non-arm's length price</u>."

19 C.F.R. § 351.102(b)(35) (emphasis added).  After determining that BMB and BL are "affiliated

persons," Commerce was required to ascertain whether the transactions at issue were made outside

the "ordinary course of trade," and, only if so, whether the transactions were consummated at a

non-arm's-length price.  <u>See</u> <u>Mid Continent Steel</u>, 219 F. Supp. 3d at 1349.

In its final determination, Commerce determined that certain transactions between BMB

and BL were not at arm's-length because "the prices at issue differ significantly from the prices

charged to an unaffiliated company (<u>i.e.</u>, they are not within 98 to 102 percent of the price charged

for or by an unaffiliated party)," so that Commerce concluded "that these prices are affected by

the relationship between [BMB] and [BL]."  <u>I&D Memo</u> at 23–24.  Thus, Commerce adjusted

BMB's freight and related expenses involving BL "to state them on an arm's-length basis."  <u>Id.</u> at

24.  According to the government, "Commerce provided notice to the parties involved in

antidumping proceedings that there would be a prospective change in its arm's length methodology

regarding sales between affiliated parties," and that Commerce applied this methodology to the

transactions at issue.  Gov. Br. at 16.

---

[15] <u>See</u>, <u>e.g.</u>, <u>Atar, S.r.L. v. United States</u>, 637 F. Supp. 2d 1068, 1091 (CIT 2009) (sustaining
Commerce's determination that exporter's payment of a salary to a minority shareholder of an
affiliated party was "an arm's-length transaction between affiliated parties."); <u>Jinxiang Chengda
Imp. & Exp. Co. v. United States</u>, Ct No. 11-144, Slip Op. 13-40, 2013 WL 1490723, at *8–*9
(CIT Mar. 25, 2013) (sustaining Commerce's determination that certain of an exporter's home
market sales to affiliated parties were arm's-length transactions).

In 2002, Commerce issued an interpretive rule wherein it established a "new test" to determine whether to include affiliated-party sales in the NV calculation. See AP Rulemaking, 67 Fed. Reg. at 69,187.[16]  Under this test, sales between an exporter or producer and its affiliate are included in the NV calculation only if Commerce determines "that the overall ratio" calculated for affiliated-party sales is "between 98 percent and 102 percent, inclusive, of prices to unaffiliated customers."  Id.  According to Commerce, sales between affiliated parties that fall without this range are per se outside the "ordinary course of trade."  Id.  During the investigation, BMB submitted evidence to demonstrate that BMB's transactions with BL were at arm's-length.  See BMB's Case Br. at 36.  In the Final Determination, Commerce accepted these submissions to find that certain of BMB's service transactions were at arm's length and others were not.  See I&D Memo at 23–24.

The issue here is whether Commerce may apply its 98-102 range test to determine if ordinary course prices are fairly reflected between the affiliated parties.  Whether or not Commerce previously had only applied the test to sales and not services, there seems to be no reason it cannot do so.  This matter involved a new investigation, not merely a review.  Thus, the reliance that BMB claims is attenuated.  Perhaps the 98-102 test is a flawed one where services are concerned, but this record here doesn't show that to be so.  Neither party here produced evidence or viable arguments to reject Commerce's choice.

Thus, for home market sales, the unaffiliated party's charges could be substituted for those charged by BL.  For the U.S. sales, where there were no unaffiliated party transactions to provide

---

[16] Commerce explained that this "new test is consistent with the view, expressed by the WTO Appellate Body, that rules aimed at preventing the distortion of normal value through sales between affiliates should reflect, 'even-handedly,' that 'both high and low-priced sales between affiliates might not be 'in the ordinary course of trade.'"  AP Rulemaking, 67 Fed. Reg. at 69,187 (quotation omitted).

a measure for the upward adjustment to NV, Commerce used BL's costs, i.e. it removed profit, which Commerce asserts is its normal practice in such a situation.  <u>I&D Memo</u> at 27–28.  Having rejected BL's charges as a measure on one side of the equation, Commerce seems to have acted fairly in not relying on them on the other side.  Without an unaffiliated company measure there was no best measure.  Commerce's answer seems as good as the next imperfect measure.  Despite Defendant-Intervenor's objection to the adjustment, it did not provide evidence to undermine Commerce's choice or to demonstrate that this was not its ordinary practice.  Thus, this adjustment is also sustained.

**CONCLUSION**

For the foregoing reasons, it is

**ORDERED** that Commerce may not adjust costs based on a PMS for purposes of the sales below cost of production test of NV;

**ORDERED** that Commerce's recognition of an adjustment for a post-sale price reduction for certain home-market sales is sustained but is remanded for reconsideration as to amount;

**ORDERED** that Commerce shall reconsider the date of U.S. sales; and it is further

**ORDERED** that Commerce's methodology for calculating freight and warehousing services adjustments is sustained.

Remand results are to be filed by March 9, 2020. Objections are due April 8, 2020 and Responses to Objections are due April 22, 2020.

    /s/ Jane A. Restani
    Jane A. Restani, Judge

Dated: January 07, 2020
New York, New York