Slip Op. 20-71

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **BORUSAN MANNESMANN BORU SANAYI VE TICARET A.Ş.,** | |
| Plaintiff, | Before: Jane A. Restani, Judge |
| **AMERICAN CAST IRON PIPE COMPANY,** *et al.*, | Consol. Court No. 19-00056 |
| Consolidated Plaintiffs, | PUBLIC VERSION |
| v. | |
| **UNITED STATES,** | |
| Defendant, | |
| **AMERICAN CAST IRON PIPE COMPANY,** *et al.*, | |
| Defendant-Intervenors, and | |
| **BORUSAN MANNESMANN BORU SANAYI VE TICARET A.Ş,** | |
| Consolidated Defendant-Intervenor. | |

## OPINION AND ORDER

[Commerce's Final Results of Redetermination Pursuant to Court Remand are sustained]

Dated: May 22, 2020

Julie C. Mendoza, Donald B. Cameron, R. Will Planert, Brady W. Mills, Mary S. Hodgins, Edward J. Thomas, III, Eugene Degnan, Jordan L. Fleischer, Sabahat Chaudhary, and Rudi W. Planert, Morris, Manning & Martin L.L.P., of Washington, D.C., for Plaintiff and Consolidated Defendant-Intervenor Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş.

Timothy C. Brightbill, Maureen E. Thorson, Laura El-Sabaawi, Adam M. Teslik, Elizabeth S. Lee, Enbar Toledano, and Tessa V. Capeloto, Wiley Rein L.L.P., of Washington, D.C., for

**Public Version**

Consolidated Plaintiffs and Defendant-Intervenors American Cast Iron Pipe Company, Berg Steel Pipe Corporation, Berg Spiral Pipe Corporation, Dura-Bond Industries, Strupp Corporation, Greens Bayou Pipe Mill LP, JSW Steel (USA) Inc., Skyline Steel, Trinity Products LLC, and Welspun Tubular LLC.

   Robert R. Kiepura, Trial Attorney, and L. Misha Preheim, Assistant Director, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of Washington, D.C., for Defendant United States of America. With them on the brief were Joseph H. Hunt, Assistant Attorney General, and Jeanne E. Davidson, Director, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of Washington, D.C. Of counsel on the brief was Reza Karamloo, Senior Attorney, Office of the Chief Counsel, Commercial Litigation Branch for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

   Restani, Judge: This matter is before the court following a remand to the Department of Commerce ("Commerce") in Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. v. United States, 426 F. Supp. 3d 1395 (CIT 2020) ("Borusan"), in which Plaintiff, Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. ("BMB"), challenges a final determination and resulting antidumping duty order as to certain Large Diameter Welded Pipe ("LDWP") from the Republic of Turkey. See Large Diameter Welded Pipe from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value, 84 Fed. Reg. 6,362 (Dep't Commerce Feb. 27, 2019) ("Final Determination"); Large Diameter Welded Pipe from the Republic of Turkey: Amended Final Affirmative Antidumping Duty Determination & Antidumping Duty Order, 84 Fed. Reg. 18,799 (Dep't Commerce May 2, 2019).

   In Borusan, the court upheld Commerce's determination that BMB was entitled to a post-sale price adjustment and concluded that Commerce's application of its new arm's-length test to BMB's home-market transactions with its affiliate was not contrary to law. Borusan, 426 F. Supp. 3d at 1406–10, 1413–14. The court remanded to Commerce to reconsider (1) the amount of BMB's downward post-sale price adjustment on its home market sales and (2) the date of BMB's U.S. sales, and ordered Commerce to eliminate any adjustment to BMB's sales below the costs of

production based on a finding that a particular market situation ("PMS") exists in the exporting country. See id. at 1415.

Following remand, Commerce concluded it did not have additional evidence showing an improper allocation of the post-sale price adjustment to BMB. Final Results of Redetermination Pursuant to Court Remand, ECF No. 86 at 1, 4 (Mar. 9, 2020) ("Remand Results"). Thus, Commerce, under protest, granted BMB "the full amount of the post-sale price adjustment," which resulted in a de minimis estimated weighted-average dumping margin. Id. at 1, 4. Accordingly, Commerce did not address BMB's U.S. date of sale or sales-below-cost because doing so would be an exercise in futility. Id. at 4. The Remand Results adequately address the court's concerns in Borusan and they are supported by substantial evidence. Accordingly, the Remand Results are sustained.

## BACKGROUND

While the court presumes familiarity with the record in Borusan, the court briefly summarizes the relevant record evidence for ease of reference. The period of investigation covers January 1 through December 31, 2017. See Final Determination, 84 Fed. Reg. at 6,362. In Autumn 2013, BMB and two other Turkish LDWP producers (the "Consortium Members") formed a general partnership (the "Consortium"). See BMB's Resp. to Commerce's Suppl. Sections A-C Questionnaire, C.R. 200-225, P R. 173-174 (June 15, 2018), ECF No. 100 at 38–45 (May 5, 2020). (the "2013 Joint Venture Agreement"). The 2013 Joint Venture Agreement recognizes joint and several liability among the Consortium Members as to the Consortium's liabilities to third-parties, and goes on to create an irrevocable guaranty arrangement between the Consortium and the Consortium Members.[1]

---

[1] The guaranty arrangement provides that "[[

Consol. Court No. 19-00056 Page 4
**Public Version**

  In Spring 2014, in advance of submitting their bid for a domestic pipeline project, the Consortium Members concluded a second written agreement in which they re-affirmed their individual obligations to the Consortium in view of the specific project's requirements. See BMB's Resp. to Commerce's Suppl. Sections A-C Questionnaire, C.R. 200-225, P R. 173-174 (June 15, 2018), ECF No. 100 at 47–48 (May 5, 2020) ("2014 Consortium Agreement").  Specifically, the 2014 Consortium Agreement reiterates the Consortium Members' joint and several liability as to the Client and provides that should any Consortium Member fail to fulfill its obligations to the Client, the other two Members would indemnify those obligations. Id. at ¶ 2.  The Consortium won the bid and, in Autumn 2014, agreed to sell certain quantities of LDWP to the Client. See BMB's Suppl. Resp. to Commerce's Second Suppl. Questionnaire, CR. 280-288, P.R. 180, Ex. B-32 (July 6, 2018), ECF No. 100 at 60–199 (May 5, 2020) (the "Sales Contract").  As a condition precedent to the Client's performance, the Consortium was required to provide the Client a written guaranty agreement demonstrating that each Consortium Member indemnifies the others' obligations as to the Client. See id. at 99, ¶ 6.4.[2]

---

]], providing furthermore that each Consortium Member "[[

]]" including any [[

]]2013 Joint Venture Agreement, at 39, ¶ 6(2) (emphases added).

The court's previous opinion seems to state that an agreement containing this exact language was presented to the Client; it appears that there is no evidence to that effect.  Commerce did not comment on this point now raised by Domestic Producers.

[2] Compare Sales Contract at 99, ¶ 6.4 [[     ]] with id. at 70, ¶ 1.2- [[
     ]].

Case 1:19-cv-00056-JAR    Document 103    Filed 05/22/20    Page 5 of 14

Consol. Court No. 19-00056                                                                                                Page 5
**Public Version**

In June 2018, pursuant to the 2014 Consortium Agreement, BMB negotiated a settlement with the Client on behalf of the Consortium for [[          ]], the whole of which was invoiced to BMB, as leader of the Consortium, "on behalf of" the Consortium for the contractual late delivery penalties incurred in 2017.  See BMB's Resp. to Commerce's Suppl. Questionnaire, C.R. 200-225, P.R. 173-174, Ex. B-28 (June 15, 2018), ECF No. 65-1 at 144 (Oct. 30, 2019).  The Consortium Members agreed, pursuant to the 2014 Consortium Agreement, that BMB's liability as to the other Consortium Members was [[          ]], the same amount for which it seeks a post-sale price adjustment.  See BMB's Resp. to Commerce's Suppl. Questionnaire, C.R. 200-225, P.R. 173-174, Ex. B-28 (June 15, 2018), ECF No. 65-1 at 147–153 (Oct. 30, 2019) ("2018 Consortium Protocol").  Nevertheless, in the Final Determination, Commerce allocated the penalty equally among the Consortium Members, and BMB sought review here.  See Borusan, 426 F. Supp. 3d at 1404–05.

Accordingly, the court sustained Commerce's determination that BMB is entitled to a downward post-sale price adjustment for the foregoing home-market sales expenses, in view of 19 C.F.R. §§ 351.102(b)(38) and 351.401(c) (2018).[3]  See id. at 1406–10, 1406 n.11.  Nevertheless, the court remanded to Commerce to reconsider whether the foregoing documents or any other "evidence not previously cited" establishes that BMB "was liable for and actually paid or was credited" a sum less than the full amount that BMB seeks in its adjustment.  See id. at 1410.

---

[3] All further citations to the Code of Federal Regulations are to the 2018 version, unless otherwise indicated.

Case 1:19-cv-00056-JAR    Document 103    Filed 05/22/20    Page 6 of 14

Consol. Court No. 19-00056                                                                                          Page 6
**Public Version**

## JURISDICTION & STANDARD OF REVIEW

The court's jurisdiction continues pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c) (2018).[4]  The court sustains Commerce's final redetermination results unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand are also reviewed for compliance with the court's remand order."  U.S. Steel Corp. v. United States, 219 F. Supp. 3d 1300, 1307 (CIT 2017) (internal quotations and citations omitted).

## DISCUSSION

### I.)    Post-Sale Price Adjustment to Normal Value Determination

In Borusan, notwithstanding the statutory definition of "normal value," the court deferred to Commerce's interpretation of its regulations, concluding that Commerce may disregard certain home market sales adjustments "'on a case-by-case basis and in the light of the evidence and arguments on each record'" when determining whether, and to what extent, a respondent is entitled to a post-sale price adjustment to normal value.  Borusan 426 F. Supp. 3d at 1406 (quoting Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings, 81 Fed. Reg. 15,641, 15,645 (Dep't Commerce Mar. 24, 2016) ("Final Modification")).  In view of Commerce's decision to grant BMB a partial post-sale price adjustment,[5] the court reasoned that BMB had established its entitlement to an adjustment to Commerce's satisfaction.  See id. at 1407–09.  The problem seen by the court was that there was no substantial evidence to support equal allocation of the adjustment among the Consortium Members.  See id. 1409.  Accordingly, the court remanded to Commerce "to review the penalty documents" or "evidence not previously

---

[4] All further citations to the United States Code are to the 2018 edition, unless otherwise indicated.

[5] See Final Determination, 84 Fed. Reg. at 6,362.

cited" to determine whether BMB met its burden as to its claimed adjustment. Id. at 1410. The court did not "specifically reject[]" any methodologies, although Commerce was not incorrect that without more evidence or a new explanation, the court would reject equal allocation. See Remand Results at 7.

Having found no new evidence to support the equal allocation, Commerce granted BMB "the full amount of the post-sale price adjustment" under protest because it is "unable to cite such evidence" supporting an alternative calculation. Id. Defendant, the United States of America (the "government"), contends that Commerce "analyzed record information to assess the calculation of the post-sale adjustment" and, after reconsidering the evidence, "redetermined the post-sale adjustment to reflect the post-sale price adjustment" that BMB claimed during the investigation. Def.'s Resp. to Cmts. on the Remand Redetermination, ECF No. 98, at 3 (Apr. 22, 2020) ("Gov. Reply"). The government avers that Commerce's redetermination is reasonable and supported by substantial evidence. Id. at 6–7.

For their part, the Defendant-Intervenors, American Cast Iron Pipe Company, et al. (the "Domestic Producers"), maintain that (1) BMB is not entitled to any post-sale price adjustment, (2) Commerce should have applied an adverse inference based upon facts otherwise available ("AFA") in view of BMB's alleged noncooperation with Commerce, and (3) record evidence does not support BMB's penalty calculation because the Client was not aware of the guaranty arrangement at the time of sale. See Def.-Intervenors' Cmts. on Remand Determination, ECF No. 93 at 6–16 (Apr. 8, 2020) ("Dom. Prod. Br.").[6] The Domestic Producers contend that the court's

---

[6] The court has already concluded that Commerce's determinations to grant BMB a post-sale price adjustment and not to apply AFA are supported by substantial evidence and not contrary to law. See Borusan, 426 F. Supp. 3d at 1404 n.7. On remand, the Domestic Producers do not point to any additional evidence in the record to demonstrate that these determinations were improper. Nor

Case 1:19-cv-00056-JAR   Document 103   Filed 05/22/20   Page 8 of 14

Consol. Court No. 19-00056                                                                 Page 8
**Public Version**

description of the penalty documents in Borusan was incomplete. Dom. Prod. Br. at 6. In their view, a party is entitled to a post-sale price adjustment only if "the terms and conditions of the adjustment were established and known to the customer at the time of sale." Id. at 6–7 (emphasis added). They say that Appendix L to the Sales Contract is merely a summary of BMB's guaranty arrangement with the Consortium, so that the Client was unaware of the Consortium Members' "agreement to mutually reimburse one another for penalties incurred by the [C]onsortium as a whole [[                                        ]]." Id. at 10. Additionally, the Domestic Producers claim that substantial evidence does not support BMB's methodology for calculating its claimed post-sale price adjustment. Id. at 14–16. Finally, they contend that even if BMB is entitled to a post-sale price adjustment and even if Commerce's calculation methodology is permissible, substantial evidence supports only an amount equal to "one-third of the total penalty amount called for under the original contract terms." Id. at 13. The Domestic Producers are incorrect on each score.

First, the Final Modification factors are "non-exhaustive," and "Commerce weighs [them] singly or in combination." China Steel Corp. v. United States, 393 F. Supp. 3d 1322, 1347 (CIT 2019) (citing Final Modification, 81 Fed. Reg. at 15,644–45). The knowledge factor tests "[w]hether the terms and conditions of the adjustment were established and/or known to the customer at the time of sale, and whether this can be demonstrated through documentation." Final Modification, 81 Fed. Reg. at 15,644–45 (emphasis added). Commerce has at times required "proof that buyers were aware of the conditions to be fulfilled and the approximate amount of the rebates at the time of sale." China Steel, 393 F. Supp. 3d at 1347 (internal quotation and citation omitted). Each of these requirements is met here. Appendix L to the Sales Contract and the 2014

---

did they do so before Commerce. See Remand Results at 7. Accordingly, the court rejects these arguments at the outset.

Case 1:19-cv-00056-JAR   Document 103   Filed 05/22/20   Page 9 of 14

Consol. Court No. 19-00056                                                                     Page 9
**Public Version**

Consortium Agreement are identical, and each provides that BMB may indemnify the other Consortium Members for any liabilities that accrue to the Client under the Sales Contract. Compare Sales Contract, App'x L, at 183–84 with 2014 Consortium Agreement at 47–48. Further, as the Domestic Producers acknowledge, the Sales Contract sets the per diem late delivery penalty rate to a figure certain. See Dom. Prod. Br. at 12 (citing Sales Contract at 103–04, ¶ 8.2.1). The Sales Contract also establishes the per diem late delivery penalty rates. See Sales Contract at 105, ¶ 9.1. Accordingly, the Client necessarily knew, at a time of sale predating the period of investigation, of BMB's guaranty arrangement with the Consortium, the general terms and conditions of that arrangement, and the approximate sum for which BMB could be liable to the Client on behalf of the Consortium pursuant to the Sales Contract. Likewise, the terms and conditions of the guaranty necessarily were "established" at the time of sale, even if the Client did not receive a copy of the contract whereby all of the duties of the Members of the Consortium to each other were set forth.[7]

Given the guaranty arrangement, it would not be important to the Client which party would ultimately bear the loss. They were all on the hook for any penalties owed to it. What should be important is that the principles and terms of the allocation were contractually set between the Consortium Members prior to the investigation at issue. Although the court does not substitute its own view of the record, Commerce "'must reasonably tie the determination'" to the facts upon which it is relying. Vicentin S.A.I.C. v. United States, 404 F. Supp. 3d 1323, 1334 (CIT 2019)

---

[7] No party, including the Domestic Producers, asked the court to reconsider its remand opinion on this point or to amend its remand instructions prior to completion of the remand. It is simply too late to raise this point. If the factual discrepancy described supra note 1 were material, the court even now would reconsider broadening the remand instructions, but it is not. All relevant terms were established and the obligation for the penalty was clearly part of the Sales Contract with the Client, as Commerce so found.

Case 1:19-cv-00056-JAR    Document 103    Filed 05/22/20    Page 10 of 14

Consol. Court No. 19-00056                                                                                            Page 10
**Public Version**

(quoting <u>CS Wind Viet. Co., Ltd. v. United States</u>, 832 F.3d 1367, 1376 (Fed. Cir. 2016)).  The record evidence shows that each Consortium Member was responsible for its own late deliveries relating to its sales.  <u>See</u> Documentation from BMB's Second Suppl. Sections A-C Questionnaire, C.R. 280-288, P.R. 190, Ex. B-32 (July 6, 2018), ECF No. 100 at 201–22, 243–56 (May 5, 2020) ("<u>Late Penalty Settlement Documents</u>").  No Member's responsibility was set at one-third of the total penalty amount.  <u>See</u> <u>id.</u>; <u>see also</u> <u>2018 Consortium Protocol.</u>  A primary concern with post-sale price adjustments is the "potential to manipulate the dumping margins."  <u>See</u> <u>Final Modification</u>, 81 Fed. Reg. at 15,645.  Neither Commerce nor the Defendant-Intervenors point to any evidence of suspected or actual manipulation, and the court finds none in the record.  The Client had full knowledge of the penalty obligations of the full Consortium; the Client's knowledge at the time of sale of the precise allocation method among the Consortium Members is immaterial to the instant case.  It is as incorrect to credit BMB with one-third of the post-sale price adjustment as it would be to credit it with the entire penalty amount that it did not ultimately pay.

Second, the Domestic Producers contend that Commerce's calculation methodology is incorrect because the total "penalty amount simply does not reflect the contract terms in place at the time of sale."  Dom. Prod. Br. at 12.  Conceding that the <u>Sales Contract</u> establishes [[

]] the Domestic Producers insist that Commerce should have calculated the Consortium's per diem delay penalty rate pursuant to the penalty clause in the <u>Sales Contract</u>.  <u>See</u> <u>id.</u> at 11–12.  Although Commerce verified the final penalty amount that the Consortium actually paid to the Client, the Domestic Producers appear to argue that Commerce should determine whether the final penalty amount accords with the <u>Sales Contract</u>, irrespective of the verified amount actually paid.  <u>See</u> <u>id.</u> at 12–13.  In their view, the total late delivery penalty amount pursuant to the <u>Sales Contract</u> is simply [[            ]] the product of

Case 1:19-cv-00056-JAR   Document 103   Filed 05/22/20   Page 11 of 14

Consol. Court No. 19-00056                                                                                  Page 11
**Public Version**

the number of delay days for each unit and the price of each unit.  Id. at 12.  This argument lacks merit.  The adjustment pursuant to the text of the Sales Contract is a percentage of [[

]] per diem, where [[

]].  Sales Contract, at 71 ¶ 1.2, 104 ¶ 8.2.1.  Commerce "independently verified," and the record supports, that BMB's payment of [[          ]] was pursuant to an obligation specified by these provisions of the Sales Contract.  See Borusan, 426 F. Supp. 3d at 1409.

Where Commerce operates within the bounds of the statute, reasonably interprets its own regulations, and makes decisions based upon substantial evidence, it "is afforded great latitude in the choice of methodology to be employed in antidumping investigations."  Timken Co. v. United States, 930 F. Supp. 621, 630 (CIT 1996) (internal quotation and citations omitted).  There does not appear to be a real challenge to methodology. Rather, the question is one of substantial evidence supporting the adjustment.  When making post-sale price adjustments to normal value based on price, the question is whether the claimed adjustment is "reasonably attributable to the subject merchandise or the foreign like product."  19 C.F.R. § 351.401(c).  In this case, Commerce's determination that BMB's claimed amount is "reasonably attributable" to the foreign like product and that the penalty results from and bears a direct relationship to a home-market sale is thus supported by substantial evidence.  Accordingly, the court sustains Commerce's decision to use verified information in the record to ascertain the sum of the claimed post-sale price adjustment pursuant to a contract that predates the period of investigation.

Case 1:19-cv-00056-JAR    Document 103    Filed 05/22/20    Page 12 of 14

Consol. Court No. 19-00056                                                                                              Page 12
**Public Version**

Third, because substantial evidence supports Commerce's determination that BMB is entitled to the full amount that it claims, the Domestic Producers' final argument as to whether substantial evidence supports equal allocation among the Consortium Members necessarily fails. See Dom. Prod. Br. at 13. In sum, substantial evidence supports Commerce's determination that BMB is entitled to a post-sale price adjustment in the amount of [[         ]], because this is the sum for which BMB was liable to the Consortium Members vis-à-vis the Consortium's joint liability to the Client. See 2018 Consortium Protocol, at 284, ¶ 3.2 (amount of BMB's liability to Consortium pursuant to the Settlement Agreement); see also Late Penalty Settlement Documents, at 201–22, 245–56 (amount of Consortium's liability to Client).[8] Accordingly, because neither the Domestic Producers nor the government cite any record evidence to show that BMB manipulated or otherwise allocated the penalty amount improperly, Commerce's remand determination granting the full amount of BMB's post-sale price adjustment is sustained.

**II.)    U.S. Date of Sale & PMS Adjustment to Costs of Production Determinations**

BMB contends that Commerce's failure to address the remaining issues on remand renders the Remand Results contrary to the court's order in Borusan, and thus constitutes a waiver of BMB's challenge to those issues, and so it seeks judgment as a matter of law on the respective counts in its complaint. See Pl.'s Cmts. on the U.S. Dep't of Commerce's Mar. 9, 2020 Final Redetermination Pursuant to Ct. Remand, ECF No. 88 at 2–5 (Mar. 26, 2020) ("BMB Br."). The government replies that Commerce's decision not to expend resources "to reach the additional

---

[8] The record also contains invoices and documentation of bank transfers. See Documentation from BMB's Second Suppl. Section A-C Questionnaire, C.R. 280-288, P.R. 190, Ex. B-32 (July 6, 2018), ECF No. 100 at 328–38 (May 5, 2020). The bank transfers show that in July 2018, BMB remitted a total sum of [[          ]] to the Client. See id. at 333–38.

Case 1:19-cv-00056-JAR   Document 103   Filed 05/22/20   Page 13 of 14

Consol. Court No. 19-00056                                                                                           Page 13
**Public Version**

issues that would have no effect" on the outcome was reasonable under these circumstances, and should be sustained. Gov. Reply 8–9.

By Commerce's determination that a properly-calculated post-sale price adjustment renders BMB's estimated weighted-average dumping margin de minimis, BMB has secured the maximum possible relief to which it may be entitled under 19 U.S.C. § 1516a – namely, pursuant to 19 U.S.C. § 1673d(a)(4), its merchandise "will be excluded from the underlying antidumping duty order." Remand Results at 11. Thus, the correctness of Commerce's determinations as to BMB's U.S. date of sale and its costs of production no longer present a live dispute between BMB and the government. See Pro-Team Coil Nail Enter., v. United States, 419 F. Supp. 3d 1319, 1340 (CIT 2019) (citing Camreta v. Greene, 563 U.S. 692, 717 (2011)). Because the Domestic Producers do not challenge Commerce's failure to reconsider either of these issues on remand, there is no actual controversy between the three parties on these two issues at this stage of the proceedings. See Gerdau Ameristeel Corp. v. United States, 519 F.3d 1336, 1340 (Fed. Cir. 2008) (quoting Hall v. Beals, 396 U.S. 45, 48 (1969)) (further judicial inquiry into non-live issues risks rendering impermissible "'advisory opinions on abstract propositions of law.'"). Commerce was instructed to reexamine the whole record to determine whether substantial evidence supports the Final Determination, and Commerce did so reasonably. The court's objective is not to impose needless expenses or to waste an agency's time. See Roses Inc. v. United States, 774 F. Supp. 1376, 1380–81 (CIT 1991). Commerce was not incorrect in assuming the court did not require useless acts. Accordingly, Commerce's Remand Results are sustained in full.

   **III.)** **"All-Others Rate" Determination**

Commerce also has determined that because BMB's revised estimated weighted-average dumping margin is de minimis, the all-others rate has changed. See Remand Results at 11. The

Case 1:19-cv-00056-JAR   Document 103   Filed 05/22/20   Page 14 of 14

Consol. Court No. 19-00056                                                                                  Page 14
**Public Version**

Domestic Producers contend that because the all-others rate is not at issue and was not subject to the court's remand order, Commerce's adjustment of that rate was improper.  See Dom. Prod. Br. at 16.  BMB does not challenge Commerce's adjustment to the all-others rate.  Pursuant to 19 U.S.C. § 1673d(c)(5)(A), Commerce may set the all-others rate when a "mandatory respondent['s] rate[] change[s] in the course of judicial review, even when the plaintiff does not raise a challenge to the all-others rate in its complaint or during remand proceedings."  U.S. Steel Corp. v. United States, 348 F. Supp. 3d 1248, 1254 (CIT 2018).  Accordingly, Commerce's adjustment to the all-others rate during remand proceedings was not contrary to law and will be sustained.

## CONCLUSION

For the foregoing reasons, the Remand Results are **SUSTAINED**.  Judgment will issue accordingly.

/s/ Jane A. Restani  
Jane A. Restani, Judge

Dated: May 22, 2020  
       New York, New York