# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BORUSAN MANNESMANN BORU SANAYI
VE TICARET A.S.,

                   Plaintiff,

       and

AMERICAN CAST IRON PIPE COMPANY,
*et al.*,

                 Consolidated Plaintiffs,

     v.

UNITED STATES,

                 Defendant,

       and

AMERICAN CAST IRON PIPE COMPANY,
*et al.*,

                 Defendant-Intervenors.

Before: Hon. Jane A. Restani,
         Senior Judge

Consol. Ct. No. 19-00056

## ALPPA'S COMMENTS IN OPPOSITION TO
## FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the American Line Pipe
Producers Association*

Dated: November 22, 2021

# <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION AND BACKGROUND ........................................................1

II.    ARGUMENT.................................................................................................................2

     A.    Commerce's Reversion to Borusan's Partial Post-Sale Price Adjustment..............................................................................................................2

     B.    Commerce's Removal of the Particular Market Situation Adjustment..............................................................................................................2

     C.    Commerce's Failure to Address Borusan's Date of Sale......................................13

III.    CONCLUSION............................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABB, Inc. v. United States*,
    920 F.3d 811 (Fed. Cir. 2019)....................................................................6

*Apex Frozen Foods Priv. Ltd. v. United States*,
    862 F.3d 1337 (Fed. Cir. 2017)..........................................................5, 6, 7

*Atl. Richfield Co. v. U.S. Dep't of Energy*,
    769 F.2d 771 (D.C. Cir. 1984)....................................................................6

*Cheney R.R. Co. v. ICC*,
    902 F.2d 66 (D.C. Cir. 1990).......................................................................7

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984)....................................................................................5

*ClearCorrect Operating, LLC v. Int'l Trade Comm'n*,
    810 F.3d 1283 (Fed. Cir. 2015)................................................................10

*Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Tech., Salaried & Mach.*
    *Workers*, 6 F.3d 1511 (Fed. Cir. 1993)......................................................6

*Dong-A Steel Co. v. United States*,
    475 F. Supp. 3d 1317 (Ct. Int'l Trade 2020) ............................................7

*Dong-A Steel Co. v. United States*,
    No. 19-00104, slip. op. 21-79 (Ct. Int'l Trade June 24, 2021) .................4

*Elkem Metals Co. v. United States*,
    468 F.3d 795 (Fed. Cir. 2006).....................................................................7

*Husteel Co. v. United States*,
    426 F. Supp. 3d 1376 (Ct. Int'l Trade 2020) ............................................9

*JBF RAK LLC v. United States*,
    790 F.3d 1358 (Fed. Cir. 2015)...................................................................7

*Li v. Dep't of Just.*,
    947 F.3d 804 (Fed. Cir. 2020).................................................................5, 9

*Mobile Commc'ns Corp. of Am. v. FCC*,
    77 F.3d 1399 (D.C. Cir. 1996).....................................................................7

*NEXTEEL Co. v. United States*,
355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) ........................................11

*Personalized User Model, LLP v. Google Inc.*,
797 F.3d 1341 (Fed. Cir. 2015)...........................................................11, 12

*Pohang Iron & Steel Co. v. United States*,
23 CIT 778 (1999) ..................................................................................10

*PSC VSMPO-Avisma Corp. v. United States*,
688 F.3d 751 (Fed. Cir. 2012)..................................................................6

*Saha Thai Steel Pipe Pub. Co. v. United States*,
422 F. Supp. 3d 1363 (Ct. Int'l Trade 2019) ...........................................4

*Thai Plastic Bags Indus. Co. v. United States*,
36 CIT 947, 853 F. Supp. 2d 1267 (2012) ..............................................12

*Thai Plastic Bags Indus. Co. v. United States*,
746 F.3d 1358 (Fed. Cir. 2014).......................................................8, 9, 12

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*,
5 F.4th 1367 (Fed. Cir. 2021) ...................................................................1

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
426 F. Supp. 3d 1395 (Ct. Int'l Trade 2020) .....................................2, 13

*United States v. Am. Trucking Ass'ns*,
310 U.S. 534 (1940)................................................................................11

*United States v. Braxtonbrown-Smith*,
278 F.3d 1348 (D.C. Cir. 2002) ..............................................................12

*Van Hollen v. Fed. Election Comm'n*,
811 F.3d 486 (D.C. Cir. 2016) ..................................................................7

*Weddel v. Sec'y of Dep't of Health & Hum. Servs.*,
23 F.3d 388 (Fed. Cir. 1994)...................................................................11

**Statutes**

19 U.S.C. § 1677(15) ...........................................................................3, 10

19 U.S.C. § 1677b(a)(1)(B) ......................................................................8

19 U.S.C. § 1677b(b)(1) ..........................................................................10

19 U.S.C. § 1677b(b)(1)(B) .....................................................................13

**Regulations**

19 C.F.R. § 351.401(i) ...........................................................................................16

19 C.F.R. § 351.404(a) ..........................................................................................10

19 C.F.R. § 351.404(c) ..........................................................................................10

**Administrative Materials**

*Antidumping Duties; Countervailing Duties*,
    62 Fed. Reg. 27,296 (Dep't Commerce May 19, 1997) .........................................16

*Certain Cut-to-Length Carbon Steel Plate from the Russian Federation*,
    68 Fed. Reg. 3,859 (Dep't Commerce Jan. 27, 2003) .............................................9

*Stainless Steel Bar From Brazil*,
    74 Fed. Reg. 33,995 (Dep't Commerce July 14, 2009) ...........................................9

**Other Authorities**

161 Cong. Rec. H4655 (daily ed. June 25, 2015) ...................................................4, 11

S. Rep. No. 114-45 (2015) ....................................................................................4, 11, 12

Trade Preferences Extension Act of 2015,
    Pub. L. No. 114-27, § 504, 129 Stat. 362 (2015) ...................................................2

## I.     INTRODUCTION AND BACKGROUND

On behalf of the American Line Pipe Producers Association ("ALPPA"), we respectfully submit the following comments in opposition to the Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Court Remand, *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, Consol. Ct. No. 19-00056 (CIT August 26, 2021 and Oct. 5, 2021) (Nov. 2, 2021), ECF No. 115 ("Final Remand Results").

This case is an appeal from the antidumping duty investigation on *Large Diameter Welded Pipe from the Republic of Turkey*, and it has undergone several rounds of court review and remand, as outlined in the Final Remand Results.  Final Remand Results at 1-2.  Most recently, the U.S. Court of Appeals for the Federal Circuit ("CAFC") reversed the U.S. Court of International Trade's ("CIT") judgment in *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, No. 19-00056, slip op. 20-71 (Ct. Int'l Trade May 22, 2020) ("*Borusan II*") with regard to Borusan's post-sale price adjustment.  *See Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367 (Fed. Cir. 2021).  In response, on remand, Commerce has now reverted to its original investigation decision to grant Borusan only a partial post-sale price adjustment.  *See* Final Remand Results at 2.

On remand, Commerce has also removed its adjustment to Borusan's costs of production ("COP") based on a finding of a cost-based particular market situation ("PMS") for purposes of the sales-below-cost test, pursuant to the CIT's instruction in *Borusan II*.  *See id.* at 2.  The removal of the PMS adjustment results in a zero percent dumping margin for Borusan.  *Id.* Commerce declined to reconsider Borusan's U.S. date of sale, which was also remanded by the CIT in *Borusan II*.  *Id.*  Commerce found that issue to be moot because the PMS remand took Borusan's dumping margin to zero percent, and the margin would not increase above zero percent regardless of any reconsideration of the date of sale issue.  *Id.*

## II.    ARGUMENT

### A.    Commerce's Reversion to Borusan's Partial Post-Sale Price Adjustment

ALPPA supports Commerce's remand determination to revert to its decision in the underlying investigation granting Borusan only a partial post-sale price adjustment.  *Id.* at 2, 5. This remand redetermination is consistent with ALPPA's prior arguments on this issue and with the CAFC's recent opinion.

### B.    Commerce's Removal of the Particular Market Situation Adjustment

As noted above, Commerce has now removed its adjustment to Borusan's COP based on a finding of a cost-based PMS for purposes of the sales-below-cost test.  ALPPA acknowledges that the Court held in *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 426 F. Supp. 3d 1395, 1411 (Ct. Int'l Trade 2020) ("*Borusan I*"), that "no adjustment for a PMS is permitted for the sales below cost test" and thus "{o}rdered that Commerce may not adjust costs based on a PMS for purposes of the sales below cost of production test of {normal value}." *Id.* at 1414.  However, ALPPA requests that the Court reevaluate its decision and remand for Commerce to continue to make a PMS adjustment to Borusan's costs.

ALPPA believes the finding that the statute permits PMS adjustments to be made *only* when normal value is based on constructed value, and not when the sales-below-cost test is utilized, to be incorrect.  Congress passed the Trade Preferences Extension Act of 2015 ("TPEA") to address, among other things, the persistent problem of distorted COP in dumping cases.  *See* Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, § 504, 129 Stat. 362, 385 (2015).  Congress's bipartisan, bicameral solution was to expand Commerce's ability to address "{PMS}s," like the one in Turkey, that prevent proper comparisons between U.S. prices and normal value.  Section 504 of the TPEA, entitled "Particular Market Situation," amended the trade laws in four ways.

*First*, the TPEA amended the definition of "ordinary course of trade." It made clear—and indeed mandated—that "{s}ituations in which {Commerce} determines that the {PMS} prevents a proper comparison with the export price or constructed export price" are "outside the ordinary course of trade." 19 U.S.C. § 1677(15). Because Commerce may only base its calculations on sales and transactions made in the ordinary course of trade, this amendment necessarily applies to all scenarios for dumping margin calculations (*i.e.*, whether or not normal value is based on constructed value).

*Second*, the TPEA amended the portion of the normal value statute that relates to normal values based on home-market sales. It provides that if a PMS "in the exporting country does not permit a proper comparison" between home market sales and U.S. sales, then Commerce may calculate normal value using third-country sales instead. *Id.* § 1677b(a)(1)(C)(iii).

*Third*, the TPEA amended the portion of the normal value statute that relates to the calculation of that value based on third-country sales. It provides that if a PMS in a third country "prevents a proper comparison" between that surrogate country's sales and U.S. sales, then Commerce may not rely on that third country to calculate normal value. *Id.* § 1677b(a)(1)(B)(iii).

*Fourth*, the TPEA also expanded Commerce's powers with respect to constructed value calculations. The "constructed value" provision of the normal value statute now provides that, "if a {PMS} exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the {COP} in the ordinary course of trade, {Commerce} may use another calculation methodology under this part or any other calculation methodology." *Id.* § 1677b(e)(3).

The TPEA's legislative history leaves no doubt that the PMS amendments were intended to ensure that "Commerce has flexibility in calculating a duty that is not based on distorted pricing or costs," in any situation "where a {PMS} exists." S. Rep. No. 114-45, at 37 (2015) (S. Fin. Comm. Rep.). As Representative Patrick Meehan explained, the TPEA was intended to "give{} {Commerce} the kind of discretion to be able to look at the facts and to take recalcitrant countries and hold them accountable by creating what is accurate." 161 Cong. Rec. H4655, H4690 (daily ed. June 25, 2015) (statement of Rep. Patrick Meehan). Specifically, the legislation was intended to "empower{}" Commerce to "disregard prices or costs of inputs that foreign producers purchase if {the agency} has reason to believe or suspects that the inputs in question have been subsidized or dumped." *Id.*; *see also id.* at H4695 (statement of Rep. Jackson Lee) (praising the PMS provision for "allowing . . . Commerce to use a different calculation methodology to compare domestic and foreign costs if the methodology does not produce an appropriate comparison"); *id.* at H4697 (statement of Rep. Tim Ryan) ("{W}hen another country . . . dump{s} product into our market, we ought to be able to do something about it. So there is a bipartisan acknowledgment on that front{.}").

ALPPA acknowledges that the Court, in the opinion underlying these remand results, has found in several prior decisions that "Commerce's authority to apply a {PMS} adjustment is limited to the calculation of costs" in when basing its calculation on constructed value. *See, e.g.*, *Saha Thai Steel Pipe Pub. Co. v. United States*, 422 F. Supp. 3d 1363, 1369 (Ct. Int'l Trade 2019); *Dong-A Steel Co. v. United States*, No. 19-00104, slip. op. 21-79 (Ct. Int'l Trade June 24, 2021). Certain of these holdings are now on appeal at the CAFC. *See, e.g.*, *Dong-A Steel Co. v. United States*, CAFC Ct. No. 21-2153. ALPPA submits that these prior cases were decided in error and that the Court should permit the agency to continue to adhere to its practice of applying

PMS adjustments where the sales-below-cost test is utilized, until the CAFC rules definitively on the issue.

As noted above, section 504 of the TPEA amended four provisions of the antidumping statute. It added PMS provisions to all three normal value calculation scenarios. And it modified the definition of "ordinary course of trade"—which applies to all three—to clarify that sales or transactions affected by a PMS are expressly outside the ordinary course of trade. As to when a PMS arises and how it should be addressed, the statute provided no particular methodology and left such determinations to Commerce's discretion. On the specific question of whether the concept of a PMS can apply to the sales-below-cost test, the statute says nothing at all. It is erroneous to conclude that Congress "has directly spoken to the precise question at issue", *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984), and improper to construe Congress's silence as a proscription of the agency's authority.

*Chevron* sets forth a "two-part framework" for reviewing an agency's interpretation and implementation of a statutory scheme. *Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337, 1344 (Fed. Cir. 2017). At step one, the court asks "whether Congress has *directly* spoken to the *precise* question at issue." *Id.* (emphasis added) (quoting *Chevron*, 467 U.S. at 842). "If yes, that is the end of the matter, and {the court} must give effect to the unambiguously expressed intent of Congress." *Id.* (quotation omitted). But "if the statute is silent or ambiguous with respect to the specific issue," the court moves on to step two. *Id.* (quotation omitted). At step two, "the question for the court is whether the agency's answer is based on a *permissible* construction of the statute." *Id.* (emphasis added, quotation omitted). "For the second step, the court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction." *Li v. Dep't of Just.*, 947 F.3d 804, 808 (Fed. Cir. 2020)

(quotation omitted). "So long as the agency's construction of the term in the statute is reasonable, *Chevron* requires a federal court to accept the agency's construction even if the agency's reading differs from what the court believes is the best statutory interpretation." *Id.* (quotation and alteration omitted). This issue is properly analyzed under *Chevron* step two.

In cases involving the "interpretation and implementation of a statutory scheme" by an administrative agency, specific statutory interpretation rules apply. *ABB, Inc. v. United States*, 920 F.3d 811, 824 (Fed. Cir. 2019). Here, Commerce's interpretation of the antidumping statute, as amended by the TPEA, is entitled to triple deference. *First*, under *Chevron* principles, unless Congress has "directly spoken to the precise question at issue," the Court must defer to Commerce's "permissible construction of the statute." *Apex*, 862 F.3d at 1344 (quoting *Chevron*, 467 U.S. at 842). *Second*, Commerce is entitled to extra deference, that is "both greater than and distinct from" *Chevron* deference, when interpreting the antidumping statute. *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012); *Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Tech., Salaried & Mach. Workers*, 6 F.3d 1511, 1516 (Fed. Cir. 1993) (referring to Commerce as the "'master' of antidumping law, {and} worthy of considerable deference" in questions of statutory interpretation (internal citations omitted)). *Third*, deference to an agency is even further "heightened" when the agency is interpreting a new law. *Atl. Richfield Co. v. U.S. Dep't of Energy*, 769 F.2d 771, 789-90 (D.C. Cir. 1984). All three layers of deference are owed to Commerce here.

With regard to the first layer, *i.e.*, *Chevron* deference, silence is not an expression of Congressional intent for purposes of *Chevron*. To the contrary, it is well-settled that "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute," under

*Chevron* step two. *Apex*, 862 F.3d at 1343. The *expressio unius* canon of statutory construction, on which the CIT has previously relied when assessing this issue, is thus inapt in this setting. *See Dong-A Steel Co. v. United States*, 475 F. Supp. 3d 1317, 1339 (Ct. Int'l Trade 2020). "The *expressio unius* canon operates differently in {judicial} review of agency action than it does when we are directly interpreting a statute." *Van Hollen v. Fed. Election Comm'n*, 811 F.3d 486, 493-94 (D.C. Cir. 2016). In this context, as opposed to when a court construes a statute directly, "the *expressio unius* maxim" "is simply too thin a reed to support the conclusion that Congress has clearly resolved an issue." *Mobile Commc'ns Corp. of Am. v. FCC*, 77 F.3d 1399, 1405 (D.C. Cir. 1996) (quotation omitted). The courts have thus "consistently recognized that a congressional mandate in one section and silence in another often suggests not a prohibition but simply a decision not to mandate any solution in the second context, *i.e.*, to leave the question to agency discretion." *Van Hollen*, 811 F.3d at 493-94 (citation omitted); *accord Elkem Metals Co. v. United States*, 468 F.3d 795, 801 (Fed. Cir. 2006); *Cheney R.R. Co. v. ICC*, 902 F.2d 66, 69 (D.C. Cir. 1990).

Two CAFC decisions further illustrate the point. In *JBF RAK LLC v. United States*, a party argued that Commerce had exceeded its statutory authority by relying on an exception that existed in one part of the statute but not in another. 790 F.3d 1358, 1363 (Fed. Cir. 2015). In the appellant's view, "because Congress created an explicit exception in the statute for investigations but did not include one in the section relating to administrative reviews, Commerce is not able to use an 'average-to-transaction' comparison in administrative reviews." *Id.* The CAFC disagreed. Rejecting the appellant's "*expressio unius*" line of reasoning, the court concluded that Congress's silence in the relevant section meant that Congress "did not speak to the precise question at issue." *Id.* Accordingly, the CAFC determined that "{t}he fact that the statute is

silent with regard to administrative reviews does not preclude Commerce from filling gaps in the statute to properly calculate and assign antidumping duties." *Id.* at 1365 (quotation omitted).

In *Thai Plastic Bags Industries Co. v. United States*, Commerce adjusted a respondent's COP (and, by extension, normal value) where the agency found that the respondent's reporting methodology had "unreasonably distorted the cost of manufacturing for the subject merchandise." 746 F.3d 1358, 1362-63 (Fed. Cir. 2014) (quotation omitted). The respondent appealed, arguing that Commerce's adjustment was not supported by the statute, which unambiguously required Commerce to use the respondent's own records in calculating COP. *Id.* at 1365. Again, the CAFC disagreed. Reiterating the "substantial deference {afforded} to Commerce's statutory interpretation," the court noted the lack of evidence "that Commerce cannot" make the disputed adjustment. *Id.* at 1368. Furthermore, the CAFC considered the "practical" effect of prohibiting the adjustment, which would be to "distort the overall antidumping analysis." *Id.* So, too, here. *JBF RAK* and *Thai Plastic Bags* confirm that, absent a statutory prohibition against Commerce's application of a PMS adjustment for purposes of the sales-below-cost test, it cannot be said that Congress has spoken directly to the precise question at issue.

Notably, *Thai Plastic Bags* is particularly instructive. The concept of a PMS predates the TPEA and was already included in the antidumping statute. 19 U.S.C. § 1677b(a)(1)(B). And, even without specific statutory authorization, Commerce has long possessed the discretion to adjust distorted costs that do not "reasonably reflect the costs associated with the production and sale of the merchandise," including for purposes of the sales-below-cost test. *Compare id.* § 1677b(f)(1)(A) (special rules for the calculation of COP), *with id.* § 1677b(b) (instructing Commerce to disregard sales at less than the calculated COP); *see also Thai Plastic Bags*, 746

F.3d at 1362 (affirming Commerce's adjustment to distorted COP); Issues and Decision Memorandum accompanying *Stainless Steel Bar From Brazil*, 74 Fed. Reg. 33,995 (Dep't Commerce July 14, 2009) (final results of antidumping duty admin. rev.) at cmt. 2 (including additional depreciation expenses because the company's "normal accounting practices do not reasonably capture the full {COP}"); *Certain Cut-to-Length Carbon Steel Plate from the Russian Federation*, 68 Fed. Reg. 3,859, 3,861 n.3 (Dep't Commerce Jan. 27, 2003) (suspension of antidumping duty inv.) ("Examples of possible areas in which adjustments may be necessary include, but are not limited to, costs related to energy, depreciation, transactions among affiliates, barters, as well as items that are not recognized by the Russian Accounting System.").  It is thus inconsistent with the statute and the agency's longstanding practice to now hold that the statute must explicitly authorize individual adjustments for Commerce to make them.

For all of these reasons, this case is governed by *Chevron* step two, and, under step two, Commerce's interpretation in the underlying antidumping determination was reasonable and should be maintained.  At *Chevron* step two, "the court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction." *Li*, 947 F.3d at 808 (quotation omitted).  It must only be reasonable. *Id.*  Commerce's interpretation of section 504 as permitting the agency to adjust distorted costs when using the sales-below-cost test, as it undoubtedly can when utilizing constructed value, is both reasonable and the most consistent with Congress' stated intentions.

*First*, the language and organization of the statute support the agency's interpretation. "{S}ales outside the ordinary course of trade cannot be included in normal value," regardless of how it is calculated. *Husteel Co. v. United States*, 426 F. Supp. 3d 1376, 1383 (Ct. Int'l Trade 2020).  And the TPEA has amended the definition of the "ordinary course of trade" so that it

now "specifically excludes {both} below cost sales . . . and situations where a PMS would not allow for a proper comparison between normal value and export price or constructed export price." *Id.*; *see also* 19 U.S.C. § 1677(15). Thus, even when applying the sales-below-cost provision—which was not specifically amended by the TPEA—Commerce must now account for the effects of a PMS in calculating normal value. *See* 19 U.S.C. § 1677b(b)(1) (providing that, after below-cost sales have been disregarded, normal value must be based on the remaining sales that are "in the ordinary course of trade"). If Commerce were prohibited from making PMS adjustments to costs when using the sales-below-cost test, the only way to calculate normal value based on sales "in the ordinary course of trade" would be to use constructed value. The statute does not support such a constrained interpretation.

Such a reading conflicts with Commerce's established preference for calculating normal value based on home market prices whenever possible. *See* 19 C.F.R. § 351.404(a), (c); *see also Pohang Iron & Steel Co. v. United States*, 23 CIT 778 (1999). But, also, such a reading would fundamentally upend the statutory framework of the TPEA. Had Congress intended for the TPEA to read, "{w}henever a PMS exists, construct normal value using constructed value," it could have said so and avoided the effort of amending four statutory provisions individually. Any more restrictive reading renders the TPEA's amendments to normal value based on home market or third-country market sales, and the universal definition of "ordinary course of trade," superfluous. *Cf. ClearCorrect Operating, LLC v. Int'l Trade Comm'n*, 810 F.3d 1283, 1294 (Fed. Cir. 2015) ("{I}t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant{.}").

*Second*, Commerce's interpretation of section 504 in the final determination underlying this appeal is the interpretation that most conforms to Congress's stated intent. "It is fundamental that the proper function of the judicial department in matters of statutory interpretation is to carry out the will of the legislature by discerning, if possible, its 'intent' on the question presented." *Weddel v. Sec'y of Dep't of Health & Hum. Servs.*, 23 F.3d 388, 391 (Fed. Cir. 1994). And the Supreme Court has specifically cautioned that statutory language should not be read so strictly as to undermine the purposes of a legislative scheme. *Personalized User Model, LLP v. Google Inc.*, 797 F.3d 1341, 1348 (Fed. Cir. 2015) (citing *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 543 (1940) as "rejecting 'plain meaning' interpretation that would lead to 'absurd or futile results' or 'an unreasonable result' clearly at odds with legislative policy").

As discussed above, there can be no doubt that Congress intended the TPEA to provide Commerce with broad, flexible powers to address PMS distortions in reported costs, including the specific distortions at issue in this appeal. The Senate Finance Committee report introducing the PMS provision stated "that where a {PMS} exists that distorts pricing or cost . . . Commerce has flexibility in calculating a duty that is not based on distorted pricing or costs." S. Rep. No. 114-45, at 37 (2015). During House floor debates, Representative Meehan stated that the TPEA would empower Commerce to "disregard prices or costs of inputs that foreign producers purchase if {it} has reason to believe or suspects that the inputs in question have been subsidized or dumped." 161 Cong. Rec. H4655, H4690 (daily ed. June 25, 2015) (statement of Rep. Patrick Meehan). And the Court has recognized that "{t}he legislative history of the TPEA reflects a desire to give Commerce the ability to choose the appropriate methodology when a {PMS} exists." *NEXTEEL Co. v. United States*, 355 F. Supp. 3d 1336, 1349 (Ct. Int'l Trade 2019).

The TPEA's legislative history thus makes no distinction between the method of calculating normal value and straightforwardly anticipates that, when Commerce finds that a PMS exists, it will "flexib{ly} . . . calculat{e} a duty that is not based on distorted pricing or costs." S. Rep. No. 114-45, at 37 (2015). It is unreasonable to find that a statute intended to give Commerce broad, flexible powers to address PMS distortions has the practical effect of withdrawing Commerce's discretion entirely and forcing Commerce to calculate normal value based only on constructed value. The elevation of the statute's "plain language"—which does not in any way prohibit Commerce from making a PMS adjustment when applying the sales-below-cost test—over its unambiguous purpose is thus misguided. *See Personalized User Model*, 797 F.3d at 1348; *accord United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1352 (D.C. Cir. 2002).

*Third*, it is unreasonable that Commerce would have the authority to correct for distortions in the COP database when constructed value is utilized but would be powerless to address the same distortions in the same database when it is not. The CIT has recognized that "Commerce uses the same method to calculate 'costs' for both COP and {constructed value}." *Thai Plastic Bags Indus. Co. v. United States*, 36 CIT 947, 950, 853 F. Supp. 2d 1267, 1270 (2012). And the CAFC has demonstrated that the practical effect of a proffered statutory interpretation is relevant when weighing competing interpretations. *See Thai Plastic Bags*, 746 F.3d at 1368 (noting as a "practical matter" that the appellant's proffered—and ultimately rejected—interpretation would "distort the overall antidumping analysis").

Moreover, an interpretation disallowing a PMS adjustment when the sales-below-cost test is applied would unreasonably prevent Commerce from addressing the most distortive PMSs. Commerce can only calculate normal value using constructed value if there are no home market

sales in the ordinary course of trade that remain after the sales-below-cost test is applied. *See* 19 U.S.C. § 1677b(b)(1)(B). The more severe a PMS is, the more it depresses costs. And as costs become more depressed, it becomes easier and easier for low-priced sales to pass the sales-below-cost test. As long as some sales pass the test, Commerce is not permitted to calculate normal value using constructed value. Thus, under the Court's interpretation, as long as a PMS drives costs down enough that at least some home market prices pass the sales-below-cost test, there is no remedy for that PMS. It defies logic that Congress would explicitly give Commerce a tool to address a cost-based PMS, but then, through silence, make it hardest to use that tool when it is needed the most.

In sum, in construing a statute plainly intended to give Commerce flexible powers to address PMS distortions, the answer is to defer to the agency's discretion on how and when to address those distortions. Prior decisions to the contrary are not supported by the statute, violate canons of statutory construction, have the practical effect of rewriting the statute (to read, "in the event of a PMS, skip directly to constructed value"), and leave the agency in precisely the compromised situation that the TPEA was intended to prevent. Commerce's reasonable interpretation of the TPEA as permitting a PMS adjustment in the underlying final determination was lawful, and the Court should remand to Commerce to allow it to retain the PMS adjustment.

### C. Commerce's Failure to Address Borusan's Date of Sale

In *Borusan I*, the Court addressed not only Borusan's claims for a post-sale price adjustment and its challenge to the PMS adjustment, but the selection of invoice date as Borusan's U.S. date of sale. *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, No. 19-00056, slip op. 20-4 at 31 (Ct. Int'l Trade Jan. 7, 2020). The Court remanded all three of these issues. *Id.* In its remand results, Commerce has addressed only the post-sale price

adjustment and the PMS adjustment, despite the Court's specific instruction on remand that "Commerce shall address *all* open issues."  Ct. Order (Oct. 5, 2021), ECF No. 114.

While Commerce explains that its final remand redetermination removing the PMS adjustment drops Borusan's investigation margin to *de minimis* levels, Draft Results of Redetermination Pursuant to Ct. Remand, *Borusan Mannesmann Boru Sanayi ve Ticaret A.S., United States v. American Cast Iron Pipe Co et al.*, Consol. Ct. No. 19-00056 (CIT August 26, 2021) (Sept. 22, 2021) at 4, P.R.R. 2.  ALPPA requests that the Court remand to Commerce directing the agency to consider the date of sale issue as well, consistent with the Court's original remand order.  Commerce properly selected invoice date as Borusan's U.S. date of sale in the underlying investigation.  ALPPA reiterates and reincorporates by reference the arguments on this issue included with its briefs on appeal, and otherwise confirms that it is not waiving or abandoning these claims and defenses.  *See generally* Br. of Pl. Borusan Mannesmann Boru Sanayi ve Ticaret A.S. in Supp. of its Mot. For J. on the Agency R. (July 15, 2019), ECF No. 38, Reply Br. of Pl. Borusan Mannesmann Boru Sanayi ve Ticaret A.S. in Supp. of its Mot. For J. on the Agency R. (Oct. 17, 2019), ECF No. 58; Def.-Intervenors' Resp. to Pls.' Mot. for J. on the Agency R. (Sept. 26, 2019), ECF No. 50.  Rather than bypassing the issue in its final remand results, Commerce should have again found that invoice date was in fact the proper date of sale for Borusan's U.S. sales, for the reasons explained in ALPPA's response brief in this case.

During the investigation, Borusan initially reported "contract date" as its date of sale. Issues and Decision Memorandum accompanying *Large Diameter Welded Pipe from the Republic of Turkey*, 84 Fed. Reg. 6,362 (Dep't Commerce Feb. 27, 2019) (final deter. of sales at less than fair value) at 13, P.R. 295 ("I&D Memo"). However, as Commerce explained in its final decision memorandum, Borusan subsequently stated that its contracts take the form of

purchase orders, and that these can be – and were – amended over time. *Id.* (citing Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, re: *Large Diameter Welded Pipe from Turkey, Case No. A-489-833: Response to Supplemental Sections A and C Questionnaire* (May 7, 2018) at 8 n.2, C.R. 155-160, P.R. 135-138). The agency specifically sought information as to whether there was a definitive point, pre-invoicing, at which a purchase order became final, but Borusan could not identify a definitive time. *Id.* (citing Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, re: *Large Diameter Welded Pipe from Turkey, Case No. A-489-833: Response to Supplemental Sections A-C Questionnaire* (June 15, 2018) at 25-30, C.R. 202-225, P.R. 173-174). Indeed, information collected at verification indicated that Borusan's purchase orders were subject to change up to and even after invoicing. *See* Memorandum from Elizabeth Eastwood, Program Manager, AD/CVD Operations, Off. II, *et al.*, through Melissa Skinner, Dir., AD/CVD Operations, Off. II, to The File re: *Verification of the Sales Response of Borusan Mannesmann Boru Sanayi ve Ticaret A.S. (Borusan) in the Antidumping Investigation of Large Diameter Welded Pipe from the Republic of Turkey* (Oct. 22, 2018) at 6, C.R. 490, P.R. 268 ("Depending on the project, there may be changes to the purchase order after Borusan has issued invoices related to it"). Accordingly, rather than use the purchase order dates, Commerce properly relied on the earlier of invoice or shipment date as the date of sale. I&D Memo at 12-16; *see also id.* at 13 (explaining that the agency's longstanding practice, where invoicing post-dates shipment, is to rely on shipment date); Preliminary Decision Memorandum accompanying *Large Diameter Welded Pipe from the Republic of Turkey*, 83 Fed. Reg. 43,646 (Dep't Commerce Aug. 27, 2018) (prelim. deter. of sales at less than fair value and postponement of final deter.) at 8 n.32, P.R. 240 (collecting cases).

In so doing, Commerce acted consistently with its regulatory preference to use invoice date as the date of sale. *See* 19 C.F.R. § 351.401(i). Commerce correctly found that Borusan's goods were not "custom-made" and sold on "long-term contracts," and thus that the typical date of sale under the regulations should apply. Even if they had been custom goods, the purchase orders for those goods were both subject to revision and actually revised. Borusan itself acknowledged that there were numerous changes to its purchase orders. As such, Commerce reasonably found that the purchase order date did not firmly establish the date of sale. *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,349 (Dep't Commerce May 19, 1997) (stating that, if a date other than invoice date is to be used, "the terms of sale must be firmly established").

For these reasons, and those further explained in ALPPA's September 26, 2019 response brief in this appeal, Commerce appropriately selected invoice date as Borusan's date of sale, and the Court should again direct the agency to make a clear finding on this issue pursuant to another remand. The agency's remand results do not accord with the Court's order to "address *all* open issues." Despite an affirmative final determination at the agency level more than two and a half years ago, and now a successful ruling by the CAFC on the post-sale price adjustment issue, there continues to be no antidumping duties in place to protect the domestic industry from unfairly traded imports by Borusan. For critical reasons of efficiency and fairness, the domestic industry requests a determination by the agency on the remanded date of sale issue as well, so that both issues may be considered expeditiously, and any issues requiring further appeal may be handled simultaneously.

### III.    <u>CONCLUSION</u>

For these reasons, ALPPA respectfully requests that the Court remand Commerce's redetermination with respect to the PMS adjustment and with direction to issue a remand redetermination with regard to Borusan's date of sale.

Please contact us if you have any questions regarding this submission.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to American Line Pipe Producers
Association*

Dated: November 22, 2021

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that these comments comply with the word limitation requirement. The word count for ALPPA's Comments In Opposition To Final Results Of Redetermination Pursuant To Court Remand, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2016), is 5,160 words.


_/s/ Timothy C. Brightbill_
(Signature of Attorney)

Timothy C. Brightbill
(Name of Attorney)

American Line Pipe Producers Association
(Representative Of)

November 22, 2021
(Date)